McMAHON, C.J.:
Plaintiff GeigTech East Bay LLC ("GeigTech") brings this action for trade *273 dress infringement in violation of 15 U.S.C. § 1125(a) ("Lanham Act") and a state law unjust enrichment claim. The Complaint alleges that Defendant Lutron Electronics Co., Inc. ("Lutron") is selling an exposed roller shade system that infringes Plaintiffs purported trade dress. (Compl. ¶¶ 48, 52, 56, Dkt. No. 1.) Before the Court is Defendant's Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Counts II and III for failure to state a claim.[1] (Def.'s Mot. to Dismiss, Dkt. No. 46.)
Defendant's motion to dismiss is granted in part and denied in part. Count II, which alleges trade dress infringement, is well-pleaded and survives the motion. Count III, which alleges unjust enrichment, is legally insufficient and, therefore, dismissed.
BACKGROUND
Plaintiff GeigTech, is a company founded by James Geiger. (Compl. ¶ 7.) Geiger claims to be a pioneer in the field of "home integration." (Id. ) He first installed window shades as an integrator in 1999. (Id. ¶ 8.) He started his own audio visual integration company called HeAVi LLC in 2003, selling and installing home theatres, lighting, and audio systems and motorized window shades. (Id. ¶ 7.)
In or about 2011, Geiger conceived and developed a concept for roller shades that Plaintiff describes as a "new solution for the [ ] traditional methods of concealing screws, wires, and other hardware." (Id. ¶ 10.) Plaintiff alleges that, generally, any screws, wires, and mounting hardware used to install roller shades are concealed by a ceiling pocket, valance, or fascia. (Id. ¶ 8.) Rather than concealing the mounting hardware, Geiger's concept "involved exposed roller shades without any visible screws, wires, or unsightly hardware." (Id. ¶ 10.) This concept was ultimately developed and sold as the "J Geiger Shading System." (Id. ¶¶ 10, 16.)
Plaintiff purports to have a protectable trade dress on the ornamental design of J Geiger's jamb bracket, center bracket, and end bracket, and has inserted pictures of each within the Complaint. (Id. ¶¶ 44, 45.) It describes its jamb bracket as "pretty," "simple," and "Simply. Modern." (Id. ¶ 45.) The Complaint states that Plaintiff's "pioneering signature look" is represented by two types of brackets - a circular bracket and a U-shaped bracket - with "floating" couplers that connect two shades together. (Id. ¶ 14). The pleading describes these brackets as "clean circular element[s] that [are] integral and seamless with both the shade and the wall." (Id. ¶ 45.) It further alleges that, "Mr. Geiger's new hardware was elegant and distinct from traditional methods of window dress," and describes the design of its brackets as "ornamental." (Id. ¶ 11.)
According to Plaintiff, sales of such shades increased year-over-year 286% from 2014-15, and 412% from 2015-16. However, they only increased 50% from 2016-17. (Id. ¶ 16.) Absolute levels of sales are not alleged.
Plaintiff claims that, after it entered into a manufacturing sales agreement with Savant Systems, LLC, Defendant Lutron, a well-known provider of electronic shades, announced its Palladiom Shading System. (Id. ¶ 48.) Defendant's shading system, Plaintiff alleges, incorporates jamb, center, and end brackets that infringe on the J Geiger jamb, center, and end bracket trade dress. (Id. ¶¶ 48, 52, 26.)
*274 Plaintiff commenced this lawsuit by filing a complaint, and Defendant has filed a motion to dismiss Counts II and III, pursuant to Fed. R. Civ. P. 12(b)(6).
DISCUSSION
A. Standard of Review for a Motion to Dismiss
Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).
While all reasonable inferences should be drawn in favor of the plaintiff, courts are not required to "accept as true a legal conclusion couched as a factual allegation." Bell Atl. Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The complaint must contain sufficient factual allegations to "nudge[ ] their claims across the line from conceivable to plausible." Id. at 547, 127 S.Ct. 1955. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Iqbal , 556 U.S. at 679, 129 S.Ct. 1937.
"In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." Hayden v. Cty. of Nassau , 180 F.3d 42, 54 (2d Cir. 1999).
B. The Motion to Dismiss Count II is Denied
A product's unregistered trade dress is protected if it is not functional and if there is a likelihood of confusion between a claimant's product and a competing product. 15 U.S.C.A. § 1125(a) ; Wal-Mart Stores, Inc. v. Samara Bros. , 529 U.S. 205, 210, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) ; Nora Beverages, Inc. v. Perrier Group of America, Inc. , 269 F.3d 114, 118-119 (2d Cir. 2001). The trade dress must also have acquired secondary meaning. Nora Beverages , 269 F.3d at 118 ; DO Denim, LLC v. Fried Denim, Inc. , 634 F.Supp.2d 403, 407 (S.D.N.Y. 2009).
"[T]rade dress today encompasses a broad concept of how a product presented to the public looks, including its color, design, container, and all the elements that make up its total appearance." Fun-Damental Too, Ltd. v. Gemmy Indus. Corp. , 111 F.3d 993, 1001 (2d Cir. 1997). In the Second Circuit, a product design trade dress infringement claim under § 43(a) consists of four elements. See Sherwood 48 Assoc. v. Sony Corp. of America , 76 Fed. Appx. 389, 391 (2d Cir. 2003) ; Telebrands Corp. v. Del Labs., Inc. , 719 F.Supp.2d 283, 296 (S.D.N.Y. 2010) ; National Lighting Co., Inc. v. Bridge Metal Industries, LLC , 601 F.Supp.2d 556, 560-61 (S.D.N.Y. 2009).
First, "A plaintiff must [ ] offer 'a precise expression of the character and scope of the claimed trade dress.' " Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc. , No. 12 Civ. 3599, 2012 WL 3240442, at *3 (S.D.N.Y. Aug. 7, 2012) (quoting Sherwood , 76 Fed. Appx. at 391 ). Failing to identify the specific elements that make up a purported trade dress may signal to the court that a plaintiff's claim is " 'pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectible style, *275 theme or idea.' " Yurman Design, Inc. v. PAJ, Inc. , 262 F.3d 101, 117 (2d Cir. 2001) (quoting Landscape Forms, Inc. v. Columbia Cascade Co. , 113 F.3d 373, 381 (2d Cir. 1997) ).
Next, "the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C § 1125(c)(4). A purported trade dress might be functional in a purely utilitarian sense, or it might be recognized to have some aesthetic functionality. Int'l Leisure Prod., Inc. v. Sunnylife Australia , No. 16-CV-6215 (NSR), 2018 WL 1305712, at *4 (S.D.N.Y. Mar. 12, 2018) (citing Christian Louboutin S.A. v. Yves Saint Laurent , 696 F.3d 206, 219 (2d Cir. 2012) ). In cases involving the aesthetic features of a product, trade dress is functional "if the right to use it exclusively would put competitors at a significant non-reputation-related disadvantage." DO Denim , 634 F.Supp.2d at 408 (citing Yurman , 262 F.3d at 116 ). If a plaintiff fails to prove that its purported product design trade dress is nonfunctional, there is no need for a court to analyze whether it has acquired secondary meaning. TrafFix Devices, Inc. v. Marketing Displays, Inc. , 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001).
The two final elements are that a plaintiff show its trade dress has acquired secondary meaning, and that the defendant's "allegedly infringing feature ... is likely to cause confusion with the product for which protection is sought." Samara Bros. , 529 U.S. at 210, 120 S.Ct. 1339. The former requirement has been interpreted by the Supreme Court to mean that a plaintiff must show that its trade dress is distinctive. Id.
A product can be either inherently distinctive or acquire distinctiveness by developing a secondary meaning in the marketplace, which occurs when, " 'in the minds of the public, the primary significance of a product feature [ ] is to identify the source of the product rather than the product itself' " Inwood Laboratories, Inc. v. Ives Laboratories, Inc. , 456 U.S. 844, 851, n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). "An unregistered product's design trade dress cannot be inherently distinctive, and thus that 'product's design is distinctive, and therefore protectable, only upon a showing of secondary meaning.' " Metrokane, Inc. v. The Wine Enthusiast , 160 F.Supp.2d 633, 637 (S.D.N.Y. 2001). A plaintiff seeking protection over its product design trade dress must show not only secondary meaning, id. , but also that the defendant's product is so similar that it is likely to cause confusion about the product's actual source. See 15 U.S.C. § 1125(a)(1)(A) ; Samara Bros. , 529 U.S. at 210, 120 S.Ct. 1339 ; Metrokane , 160 F.Supp.2d at 639.
These are the elements a plaintiff must prove in order to prevail on a trade dress infringement claim at trial. However, this is a motion to dismiss, and a plaintiff need only articulate "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Iqbal , 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly , 550 U.S. at 570, 127 S.Ct. 1955 ).
The Complaint before this Court is one of the best-pleaded examples of a trade dress infringement claim I have ever reviewed. Whether Plaintiff can prove each of these elements is a question for another day.
1. Plaintiff Has Adequately Articulated Its Purported Trade Dress
Defendant argues that Plaintiff has failed to adequately articulate the specific elements that are distinctive to its trade dress. (Def.'s MTD, at 4-5.) "[A] Plaintiff must articulate the elements of *276 their [sic] product design with specificity to be afforded trade dress protection." Urban Grp. , 2012 WL 3240442, at *4 (internal quotation and citation omitted).
"A plaintiff's inability to explain to a court exactly which aspects of its product design[ ] merit[s] protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea." Landscape Forms , 113 F.3d at 381. Therefore, describing a trade dress in general terms or broad categories is not sufficient to state a claim for trade dress infringement. See Tracey Tooker & TT Ltd., Inc. v. Whitworth , 212 F.Supp.3d 429, 434 (S.D.N.Y. 2016) ; Landscape Forms , 113 F.3d at 381 ("focus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress.")
A trade dress infringement claimant must enumerate which features of its purported dress are distinctive and indicate how they are distinctive. Tracey Tooker , 212 F.Supp.3d at 434. (citing Heller Inc. v. Design Within Reach, Inc. , No. 09 Civ. 1909 (JGK), 2009 WL 2486054, at *6 (S.D.N.Y. Aug. 14, 2009) ); Shevy Custom Wigs, Inc. v. Aggie Wigs , No. 06 CV 1657(JG), 2006 WL 3335008, at *5 (E.D.N.Y. Nov. 17, 2006) ("The issue is not just which features are distinctive, but also how they are distinctive.") (emphasis in original).
Although the word "distinctive" does not appear in the statutory text, the Supreme Court explains that it is the linchpin of a trade dress claim:
Nothing in § 43(a) explicitly requires a producer to show that its trade dress is distinctive, but courts have universally imposed that requirement, since without distinctiveness the trade dress would not "cause confusion ... as to the origin, sponsorship, or approval of [the] goods ," as the section requires. Distinctiveness is, moreover, an explicit prerequisite for registration of trade dress under § 2, and "the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)."
Samara Bros. , 529 U.S. at 210, 120 S.Ct. 1339 (quoting Two Pesos, Inc. v. Taco Cabana, Inc. , 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) ) (emphasis added). Thus, under the Lanham Act, a plaintiff must ultimately show that its dress is distinctive.
Where a plaintiff has failed to state the concrete elements of its trade dress, some courts have found this a de facto failure to allege distinctiveness. See Tracey Tooker ("Tooker has failed to specifically identify the elements of her purported trade dress, and for that reason has also failed to adequately plead distinctiveness."). But even where elements of a purported trade dress have been identified, a plaintiff must also plead why those elements are distinctive. See Sara Designs, Inc. v. A Classic Time Watch Co. Inc. , 234 F.Supp.3d 548, 555 (S.D.N.Y. 2017).
Defendant argues that Plaintiff has failed to articulate the elements of its trade dress, and cites at least two cases within the Second Circuit in which courts dismissed a trade dress infringement complaint at the pleading stage for failure to allege the elements of their dress with adequate specificity. Each case is readily distinguishable.
In Tracey Tooker , 212 F.Supp.3d at 434, the plaintiff sought trade dress protection for a line of hats. The complaint stated only that the alleged trade dress "includes the size, shape and color of the product *277 and its packaging." Id. Because the complaint did not elaborate on exactly which size, shape, or color was unique to plaintiff's line of products, the court noted that, "These 'sweeping descriptions ... in fact denote categories of features, not the features themselves.' " Id. Plaintiff argued that each hat style within her line had its own "esthetic and decorative element," and provided photographs of the hats in her line. Id. But the court could not "distill the distinctive elements of Tooker's trade dress," and dismissed the claim for failure to "specifically identify the elements of her purported trade dress." Id. at 434-45.
Similarly, in Sara Designs, Inc. v. A Classic Time Watch Co. Inc. , 234 F.Supp.3d 548 (S.D.N.Y. 2017), the court dismissed a trade dress infringement complaint that, "merely contain[ed] a high level description of features of several watches, such as 'gradient chain,' 'lobster claw closure,' and 'leaf-shaped logo,' without allegations as to whether and how those features are distinctive." Id. at 555.
Defendant also cites Landscape Forms, Inc. v. Columbia Cascade Co. , 113 F.3d 373 (2d Cir. 1997), which came before the Second Circuit on appeal from a preliminary injunction entered by the district court. The Court of Appeals noted that, while the complaint alleged that, "The product design and configuration of [plaintiff's product] employs a number of distinctive elements which, when taken together, constitute a trade dress," it failed to articulate what exactly those "distinctive elements" were. On appeal, the plaintiff alleged its trade dress was composed of "site furniture which is at once massive, yet appears to float." The court vacated the preliminary injunction because this description of plaintiff's trade dress was "too abstract to qualify as trade dress." Id. at 382.
Here, the Complaint describes the shape and composition of Plaintiff's trade dress, as well as its overall look. See Int'l Leisure , 2018 WL 1305712, at *5. Plaintiff identifies its trade dress as consisting of J Geiger's jamb bracket, center bracket, and end bracket. (Compl. ¶ 44.) It alleges that Plaintiff's "pioneering signature look is represented by its circle and U-shaped brackets and floating couplers, which connect two shades together." (Id. ¶ 14.)
The Complaint goes on to describe each individual element in detail, with photographs for illustration. (Id. ¶¶ 45, 49, 52.) The jamb bracket is described as a clean circular element that is integral and seamless with both the shade and the wall." (Id. ¶ 45.) The center bracket is described as "a clean, U-shaped element, where the U-Shaped element fits seamlessly between two shade ends that abut the same, effectively creating a 'shade sandwich' with the U-shaped element in the middle." (Id. ¶ 49.) The end bracket is described as "a clean U-shaped element that stands alone in its ornamental connection of the end of the shade to a wall, where the outward face side of the U-shaped element is unencumbered with any of the normally 'ugly' mechanisms required to attach the element to the wall." (Id. ¶ 53.)
Plaintiff also alleges that the trade dress is distinctive: the Complaint describes the history of roller shade mounting technology, (id. ¶ 8), and states that the J. Geiger shading system is a "radical departure" from existing technology. (Id. ¶ 45.) Plaintiff attached pictures of both the J. Geiger Shading System and previous methods for concealing mounting hardware to illustrate the unique look of its shades. (Id. ¶¶ 8, 11.) It alleges that "Mr. Geiger's new hardware was elegant and distinct from traditional methods of window dress, and also allowed for screws and wires to be concealed from view." (Id. ¶ 11.)
*278 At the pleading stage, Plaintiff has adequately described the elements that make up its purported trade dress. The focus of this initial inquiry is limited only to whether Plaintiff has identified a "distinctive combination of ingredients [that] deserves protection." See Landscape Forms , 113 F.3d at 381. It has.
Notably, all of the case law cited by Defendants in support of their argument concerns instances in which the plaintiff sought protection for a line of products. See, e.g., Yurman Design , 262 F.3d at 116 ("a plaintiff seeking to protect its trade dress in a line of products must articulate the design elements that compose the trade dress") (emphasis added); Landscape Forms , 113 F.3d at 381 ("the record fail[s] to indicate what unique combination of features makes the trade dress of the ten items in the Petoskey line inherently distinctive.") (emphasis added).
In such cases, the Second Circuit has cautioned courts to be even more circumspect in order to further the "strong federal policy in favor of vigorously competitive markets," because, "a claim of trade dress covering an array of items is likely to be broader than one for an individual product's design." Landscape Forms , 113 F.3d at 380.
However, in cases dealing with the design of a single product, courts have found that plaintiffs articulate their trade dress with sufficient particularity if they describe the basic elements of the dress with reference to their distinctive features. See, e.g., Schutte Bagclosures Inc. v. Kwik Lok Corp. , 193 F.Supp.3d 245, 258 (S.D.N.Y. 2016), aff'd, 699 F. App'x 93 (2d Cir. 2017) ("Kwik Lok's asserted trade dress sufficiently identifies the elements of the trade dress: a square to slightly rectangular outer perimeter having beveled corners and a triangularly-shaped slot opening.") (on motion for summary judgment); Urban Grp. , 2012 WL 3240442, at *5 ("the Amended Complaint identifies the jumping mat and the protective fold skirt, and it describes how these elements are distinctive, namely the black and red color scheme and the presence of Plaintiff's trademark on the fold skirt") (12(b)(6) motion to dismiss). See also Eliya, Inc. v. Kohl's Dep't Stores , No. 06 Civ 195 (GEL), 2006 WL 2645196, at *5 (S.D.N.Y. Sept. 13, 2006) (12(b)(6) motion to dismiss).
Accordingly, it is sufficient that Plaintiff has identified the specific elements of its trade dress (J Geiger's jamb, center, and end brackets) and described that the elements are distinctive because they expose the hardware and wires that are traditionally visible in other mounting hardware. (Compl. ¶¶ 8, 45, 49, 52.)
2. Plaintiff Has Sufficiently Alleged Its Trade Dress is Nonfunctional
Under the Lanham Act, "In a civil action for trade dress infringement ... the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. 1125(a)(3). Because functionality is a question of fact, Kohl's , 2006 WL 2645196, at *4, it is often premature to conclude that a plaintiff has failed to establish functionality at the motion to dismiss stage. See Axis Imex, Inc. v. Sunset Bay Rattan, Inc. , No. C 08-3931 RS, 2009 WL 55178, at *3 (N.D. Cal. Jan. 7, 2009) (The "inquiry into whether a product is functional ... is fact intensive with multiple factors for the Court to consider," and "facts going to that functionality analysis cannot be resolved at the motion to dismiss stage but must await summary judgment or trial.").
Even before it was codified in the Lanham Act, see 15 U.S.C. § 1125(c)(4)(A), the functionality doctrine was developed as an affirmative defense to a trade dress *279 infringement claim in order to further the statute's purpose of promoting competition.[2] Christian Louboutin , 696 F.3d at 224 ("The purpose of the functionality defense "is to prevent advances in functional design from being monopolized by the owner of [the mark] ... in order to encourage competition and the broadest dissemination of useful design features.") (quoting Fabrication Enterprises, Inc. v. Hygenic Corp. , 64 F.3d 53, 58 (2d Cir. 1995) ). The Supreme Court has emphasized that the purpose of the Lanham Act is not to encourage innovation - such protection is extended, for a limited time, by patent law. Qualitex Co. v. Jacobson Prod. Co. , 514 U.S. 159, 164-65, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).
Thus, unregistered trade dress receives trademark protection only if granting exclusive use of that dress does not put competitors at a non-reputational disadvantage. Id. at 169, 115 S.Ct. 1300. As the Supreme Court explained, "The functionality doctrine [ ] protects competitors against a disadvantage (unrelated to recognition or reputation) that trademark protection might otherwise impose, namely, their inability reasonably to replicate important non-reputation-related product features." As such, even where a trade dress is source-identifying, its utility may render it unprotectable: for example, "competitors might be free to copy the color of a medical pill where that color serves to identify the kind of medication (e.g., a type of blood medicine) in addition to its source." Id.
" 'The test of nonfunctionality in trade dress claims that are based on product design is even more critical than in trade dress claims based on packaging, because a monopoly right in the design of the product itself is more likely to preclude competition.' " DO Denim , 634 F.Supp.2d at 408 (quoting Landscape Forms , 113 F.3d at 379-80 ). Because innovations in product design are usually spurred by consumer need for more useful or aesthetically appealing features, extending trade dress protection to product design "entails a greater risk of impinging on ideas as compared with protection of packaging or labeling." Yurman , 262 F.3d at 116.
Trade dress may be functional in a traditional sense ("utilitarian functionality"), or it may be aesthetically functional. Christian Louboutin , 696 F.3d at 217. "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." Inwood , 456 U.S. at 851, n. 10, 102 S.Ct. 2182 (citing Sears, Roebuck & Co. v. Stiffel Co. , 376 U.S. 225, 232, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) ; Kellogg Co. v. National Biscuit Co. , 305 U.S. 111, 122, 59 S.Ct. 109, 83 L.Ed. 73 (1938) ). "In cases involving an aesthetic feature, the dress is also functional if the right to use it exclusively would put competitors at a significant non-reputation-related disadvantage." Yurman Design , 262 F.3d at 116 ; DO Denim , 634 F.Supp.2d at 408.
a. Plaintiff Has Sufficiently Pleaded Traditional Nonfunctionality
Under the traditional Inwood test, a trade dress is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."
*280 Inwood , 456 U.S. at 850, n. 10, 102 S.Ct. 2182 ; Christian Louboutin , 696 F.3d at 214 n. 5 ; Int'l Leisure , 2018 WL 1305712. "A design feature of a particular article is 'essential' only if the feature is dictated by the functions to be performed; a feature that merely accommodates a useful function is not enough." LeSportsac, Inc. v. K mart Corp. , 754 F.2d 71, 76 (2d Cir. 1985).
Plaintiff has adequately pled that its trade dress is not essential to the use or purpose of its product. Indeed, it has provided a survey of other methods traditionally used to install roller blinds, and photographs of three alternative mounting techniques. (Compl. ¶¶ 8-11, 47, 51, 55.) The purported trade dress is not essential to the use or purpose of Plaintiff's product. See Cartier, Inc. v. Sardell Jewelry, Inc. , 294 F. App'x 615, 621 (2d Cir. 2008) ("Although the design of the [product] does operate to perform a function, the trade dress is not 'functional' because there are many alternative designs that could perform the same function.").
A purported trade dress may also be deemed traditionally functional if the feature over which protection is sought reduces the product's manufacturing costs or lowers its consumer retail price. Christian Louboutin , 696 F.3d 206, 219 (2d Cir. 2012) ("An asserted trade dress affects the cost or quality of the article where it permits the article to be manufactured at a lower cost or constitutes an improvement in the operation of the goods.") (internal quotations omitted); Schutte , 193 F.Supp.3d at 262 (distinctive plastic bag closure is functional where "the simple shape of the closures at issue facilitates the efficient use of the articles in automatic machines and reduces possible costs to the manufacturers of the closures and the purchasers of the closures.")
The complaint states that Plaintiff's trade dress "does not provide a cost or quality advantage in the market" for the three components of its dress: jamb brackets, center brackets, and end brackets. (Compl. ¶¶ 47, 51, 55.)
Defendant argues that Plaintiff's advertisements "tout the functional benefits of its purported trade dress, including that the design eliminates the need for valances, fascias, or ceiling pockets to hide the hardware, that the design contains no visible wires or screws." (Def.'s MTD, at 12.) A photo of one such advertisement is embedded in Defendant's motion, as well as the Complaint. (See id. at 12; compl. ¶ 18.) The ad undeniably makes these representations. In fact, such descriptions are Plaintiff's very argument that its trade dress is not functional but, rather, is purely ornamental. (See, e.g. , Compl. ¶¶ 45, 53.) Defendant does not explain why or how this description "touts the functional benefits" of Plaintiff's trade dress and proffers no other contrary assertions as to why Plaintiff's dress is essential to the use of the roller blinds, or affects the cost or quality of the blinds.
In addition, "Where the asserted trade dress extends to the 'overall look' of the combination of features comprising a product or product line, the Court must evaluate the distinctiveness and functionality of those features taken together, not in isolation." Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co. , 292 F.Supp.2d 535, 548 (S.D.N.Y. 2003). It is irrelevant whether any individual element - for example, the jamb bracket - serves a functional purpose in the sense that it is used to install or operate the blinds. Metrokane , 160 F.Supp.2d at 638-39 ("The fact that the overall design or combination contains individual features that are themselves functional does not admit that any elements of its trade dress are functional."); Eliya , 2006 WL 2645196, at *4 (denying motion to dismiss where *281 plaintiff's trade dress consisted of the "overall look" of shoe's strap, stitching, and sole, even though, standing alone, those elements were clearly functional.) Here, it is the overall look of the three brackets, taken together, that plaintiff alleges as its trade dress, (see compl. ¶ 44), and it is this combination of elements that must be analyzed for functionality.
Accepting as true, as we must at the 12(b)(6) stage, Plaintiff's allegations that its trade dress is not essential to the use or purpose of its product, and does not affect the cost or quality of the product, Plaintiff has adequately pleaded that its dress is traditionally nonfunctional under Inwood .
b. Plaintiff Has Sufficiently Pleaded Aesthetic Nonfunctionality
"If the trade dress is not functional under the traditional Inwood test, and Plaintiff asserts that the elements of [its] trade dress are ornamental or aesthetic, the aesthetic functionality doctrine requires the additional fact-intensive inquiry recognized in Qualitex [ ] and TrafFix , namely 'if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.' " Int'l Leisure , 2018 WL 1305712, at *4. See also Louboutin , 696 F.3d at 219-20 ; DO Denim , 634 F.Supp.2d at 408 ; Yurman Design , 262 F.3d at 116. An aesthetic feature cannot be protected under the Lanham Act if exclusive use would "significantly hinder competition by limiting the range of adequate alternative designs." Knitwaves, Inc. v. Lollytogs Ltd. (Inc.) , 71 F.3d 996 (2d Cir. 1995) (citing Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co., Inc. , 916 F.2d 76, 81 (2d Cir. 1990) ); Maharishi , 292 F.Supp.2d at 543.
Plaintiff pleads that its trade dress consists of the ornamental appearance and design of its jamb, center, and end brackets, and that "competitors' ability to compete is not significantly undermined by protecting J Geiger's ornamental design because other designs, such as those shown in the Background section, exist and are still used throughout the shading industry." (Compl. ¶¶ 45, 47, 51). In response, Defendant argues that "the clean and modern look of [Plaintiff's] products is desirable to consumers," and that "granting [Plaintiff] a monopoly on its vaguely alleged 'clean' and 'minimalist' design would significantly harm competition because [Defendant] and third-party competitors would be barred from introducing their own clean, minimalist window shading designs, thereby harming competition and reducing consumer choice." (Def.'s MTD, at 13).
However, Plaintiff does not seek protection over all minimalist shade designs - it seeks protection over its specific trade dress, which it describes in detail in the Complaint. Defendant and other competitors would be free to design minimalist shading systems as long as those designs did not look too similar to Plaintiff's trade dress, so that customers would be confused about their origin. See Knitwaves , 71 F.3d at 1006 ("According trademark protection to [Plaintiff's]' designs would not preclude [Defendant] from using fall colors or motifs, squirrels or leaves. It would preclude only the use of designs so similar as to create a likelihood of confusion.").
Moreover, "A finding of whether a trade dress is functional is 'essentially a fact question.' " Int'l Leisure , 2018 WL 1305712, at *6 (quoting Kohl's , 2006 WL 2645196, at *4 ). It may very well be that Defendant can produce evidence at summary judgment showing that the specific combination of elements Plaintiff seeks to protect would put competitors at a significant non-reputation disadvantage (or, likewise, that Plaintiff cannot meet its statutory burden to prove that it does not). See *282 15 U.S.C § 1125(c)(4). However, Plaintiff's allegations that protecting its trade dress would not hinder competition in the exposed roller blind market, (compl. ¶¶ 45, 47, 51), must be accepted as true for the purpose of a 12(b)(6) motion to dismiss.
Plaintiff has adequately pleaded that its trade dress is not aesthetically functional.
3. Plaintiff Has Sufficiently Pleaded Secondary Meaning
"An unregistered product's design trade dress cannot be inherently distinctive, and thus that 'product's design is distinctive, and therefore protectable, only upon a showing of secondary meaning.' " Metrokane , 160 F.Supp.2d at 637. An unregistered trademark has developed secondary meaning when, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." Inwood , 456 U.S. at 851, n. 11, 102 S.Ct. 2182 ; Yurman , 262 F.3d at 115 ; DO Denim , 634 F.Supp.2d at 407.
While secondary meaning should "not be determined by application of a rigid formula," Landscape Forms Inc. v. Columbia Cascade Co , 117 F.Supp.2d 360, 366 (S.D.N.Y. 2000), the Second Circuit has laid out several non-exclusive factors to consider, including "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) length and exclusivity of the mark's use." Metrokane , 160 F.Supp.2d at 639 (quoting U-Neek, Inc., v. Wal-Mart Stores, Inc. , 147 F.Supp.2d 158, 172 (S.D.N.Y. 2001) ). "None of these elements is determinative and not every one of them must be proved to make a showing of secondary meaning." Landscape Forms , 117 F.Supp.2d at 366.
" 'Because the primary element of secondary meaning is 'a mental association in buyer[s'] minds between the alleged mark and a single source of the product,' the determination whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry.' " LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A. , 209 F.Supp.3d 612, 638 (S.D.N.Y. 2016), aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA , 720 F. App'x 24 (2d Cir. 2017). A finding of secondary meaning "entails "vigorous evidentiary requirements." U-Neek , 147 F.Supp.2d at 172. See also Travel Magazine, Inc. v. Travel Digest, Inc. , 191 F.Supp. 830, 833 (S.D.N.Y. 1961) ("whether a mark or title has acquired secondary meaning is always a substantial question of fact").
Accordingly, none of these factors is generally amenable to determination on a motion to dismiss. Defendant's arguments regarding the qualitative nature of Plaintiff's advertising, its lack of consumer surveys, and questions regarding prior attempts to plagiarize are all evidentiary in nature and properly reviewed on motion for summary judgment. Plaintiff has adequately plead secondary meaning.
For example, the Complaint states that Plaintiff, "extensively marketed its pioneering shade system, spending approximately 1.2 million dollars during 2015-2017." (Compl. ¶ 17.) Defendant argues that this is insufficient because Plaintiff failed to describe how its advertising money was spent. (Id. at 8.) In support, it cites cases that have no bearing on a motion to dismiss: Mana Prod., Inc. v. Columbia Cosmetics Mfg. , Inc., 65 F.3d 1063 (2d Cir. 1995) was decided at the summary judgment stage, and P.F. Cosmetique, S.A. v. Minnetonka Inc. , 605 F.Supp. 662, 672-73 (S.D.N.Y. 1985) on motion for a preliminary injunction. Any finding of insufficient evidence at those stages do not weigh on whether a plaintiff has pleaded facts sufficient *283 to state a claim under Rule 12(b)(6). See DiFolco v. MSNBC Cable L.L.C. , 622 F.3d 104, 113 (2d Cir. 2010) ("the duty of a court 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' ") (quoting Cooper v. Parsky , 140 F.3d 433, 440 (2d Cir. 1998) ).
Defendant does cite two cases that were decided at the motion to dismiss stage. The first, Sara Designs , 234 F.Supp.3d at 355-56, found no secondary meaning where, inter alia , plaintiff did not plead advertising expenditures at all. Similarly, in Vedder Software Grp. Ltd. v. Ins. Servs. Offices, Inc. , No. 11-CIV-00369 (GTS/CFH), 2013 WL 12121098, *10 (N.D.N.Y. Mar. 22, 2013), a case decided outside of this district, the court found that the plaintiff had failed to plead any facts to support secondary meaning.
Here, Plaintiff has pleaded a specific amount of advertising expenditures.
Nevertheless, Defendant also argues that Plaintiff's advertising is insufficient to show secondary meaning because it promoted, "the 'functional advantages' of [Plaintiff's] product without calling attention to nonfunctional aspects of the design." (Def.'s MTD, at 9.)
"Advertising that promotes the functional advantages of a product and does not call attention to the design alleged to be non-functional provides little if any evidence of secondary meaning." Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc., No. 12 Civ. 3599, 2013 WL 866867, at *4 (S.D.N.Y. Mar. 8, 2013). In Urban Group , the only advertising the plaintiff could point to was a promotional video on the CEO's website - not the product's website - that was not alleged to be disseminated publicly. Id. The video was "not a promotion or advertisement focused on the [product], but rather promote[d] [the CEO] himself, as well as his numerous fitness-related products." Id. Such promotions are unlikely to create an association in the mind of consumers between a product and its source. See Ergotron, Inc. v. Hergo Ergonomic Support Sys., Inc. , No. 94 Civ. 2732, 1996 WL 143903, at *8 (S.D.N.Y. Mar. 29, 1996) ("just because a producer spends money on advertising does not mean that the public will make [an] association.").
Here, Plaintiff has attached dozens of examples of its print and digital advertising to its Complaint. (Compl. Ex. B.) Its ads prominently feature images and descriptions of its trade dress, and were published in magazines, newspapers, and various trade directories, or disseminated via digital platforms (i.e., email campaigns and website banner ads). (See id. ) Plaintiff also alleges that the examples of its ads attached in Exhibit B demonstrate "look for"-type advertising [which] has been a continuous and prominent part of all J Geiger marketing ever since 2012." (Id. ¶ 19.) At the motion to dismiss stage, this is sufficient to plead the advertising element of the secondary meaning test.
In addition, Plaintiff pleads facts to support the "Sales Success" factor of secondary meaning. A product's sales success might be indicative of whether consumers associate a product's trade dress with its origin. See, e.g., Harlequin Enterprises Ltd. v. Gulf & W. Corp. , 644 F.2d 946, 949 (2d Cir. 1981). As the Ninth Circuit noted, "The test of secondary meaning is the effectiveness of the effort to create it." Carter-Wallace, Inc. v. Procter & Gamble Co. , 434 F.2d 794, 802 (9th Cir. 1970). In other words, if a producer expends an enormous amount of resources in promoting its product, and as a result experiences success in selling that product, one could infer that the producer's efforts *284 in creating a link between that product and its origin were effective. See, e.g., Ergotron , 1996 WL 143903, at *8 ("The amount of sales may be indicative of whether or not a substantial portion of the purchasing public associates the trade dress with the source of the goods.") That said, sales success alone cannot establish secondary meaning. Id. , at *8.
The Complaint states that, "J Geiger began selling the J Geiger Shading System in 2014. Since that time, sales grew by 286% in 2015, followed by 412% in 2016, and 50% in 2017." (Compl. ¶ 16.) This sales growth coincides chronologically with the 1.2 million dollars in advertising expenditures that Plaintiff alleges were spent between 2015 and 2017. (Compl. ¶ 17.)
Defendant points out that Plaintiff presents no actual sales figures. However, whether Plaintiff's sales growth can be characterized as "sales success" is not a question to be resolved on a motion to dismiss. For the time being, it is sufficient that Plaintiff pleaded a growth in sales over the relevant period to plead the "Sales Success" prong of the secondary meaning analysis.
Finally, Plaintiff alleges a continuous length of use of its dress. "Secondary meaning has been found when continuous exclusive usage of a trade dress occurred over a five-year period." Bubble Genius LLC v. Smith , 239 F.Supp.3d 586, 600 (E.D.N.Y. 2017) (citing Landscape Forms , 113 F.3d at 381. However, "[N]o absolute time span can be posited as a yardstick in cases involving secondary meaning." Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc. , 830 F.2d 1217, 1225 (2d Cir. 1987) ).
The Complaint states that the J Geiger Shading System was marketed as early as 2012, but did not begin to sell the Shading System until 2014. (Compl. ¶ 16.) Plaintiff alleges that Defendant introduced its purportedly infringing Palladiom shading system in September, 2017. (Id. ¶ 21, 48 56.) In its opposition papers, Plaintiff also alleges that it had exclusive use of its trade dress until Defendant's shading system entered the market in 2017. (Opp. MTD, at 9.)
In sum, Plaintiff alleges that it spent over a million dollars in advertising its trade dress and that, in conjunction with that advertising, its sales increased dramatically year-over-year for at least two years. It also alleges that it has used its trade dress continuously since at least 2014. The Complaint also states that, "Through [ ] extensive and continuous use, J Geiger's trade dress has become a well-known indicator of the origin and quality of J Geiger's products."
Taken together, Plaintiff's factual allegations adequately plead secondary meaning for the purposes of a Fed. R. Civ. P. 12(b)(6) Motion to Dismiss. Courts have assumed secondary meaning at the motion to dismiss stage on very minimal pleadings, recognizing that determination of many factors going to secondary meaning will require discovery. See Metrokane , 160 F.Supp.2d at 640 (assuming secondary meaning for the purposes of a motion to dismiss "because the proof of secondary meaning entails vigorous evidentiary requirements, and no discovery has yet been conducted, [and] questions of fact remain.") (internal citations and quotations omitted).
Plaintiff has sufficiently pleaded secondary meaning.
4. Plaintiff Has Sufficiently Pleaded Likelihood of Confusion
In the Second Circuit, courts apply the nonexclusive factors of the Polaroid test to analyze whether Defendant's trade dress is likely to cause confusion as to the source of its product: "(1) the *285 strength of the plaintiff's mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will bridge the gap between the products; (5) actual consumer confusion between the two marks; (6) the defendant's intent or any bad faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group." Cartier , 294 F. App'x at 619 (citing Polaroid Corp. v. Polarad Elecs. Corp. , 287 F.2d 492 (2d Cir. 1961) ). Like the secondary meaning factors, the Polaroid test is nonexclusive and no one factor is dispositive. Id.
Some elements of the Polaroid test clearly do not apply or are plainly not alleged. For example, the fourth factor, "the likelihood that the plaintiff will bridge the gap between the products," is not relevant in this case: in Polaroid , the court was analyzing the likeliness of consumer confusion where two companies had a similar name ("Polaroid" and "Polarad") but produced goods in different industries. Polaroid , 287 F.2d at 496. Where, as here, the parties produce the same product in the same industry, there is no need to "bridge the gap." LVL XIII Brands , 209 F.Supp.3d at 671.
In addition, it is clear that the Complaint does not allege any actual consumer confusion. Thus, at the pleading stage, the fifth factor does not weigh in favor of Plaintiff.
However, the Complaint states, "Defendant's use of J Geiger's trade dress and/or colorable imitations thereof is likely to cause confusion, mistake, or deception as to the affiliation, connection, and/or association of Defendant with J Geiger and as to the origin, sponsorship, and/or approval of the infringing products." (Compl. ¶ 42.) Plaintiff also alleges, albeit in a somewhat general manner, the sixth factor: "Defendant's bad faith is evidenced at least by the similarity of the infringing products to J Geiger's trade dress and by Defendant's continuing disregard for J Geiger's rights." (Id. ¶ 58.)
As to the similarity of the parties' marks (the second factor), the Complaint illustrates the striking similarity between the J Geiger Shading System and Defendant's Palladiom Shading System with side-by-side photographic comparisons of the jamb, center, and end brackets from each producer. (Id. ¶¶ 48, 52, 56.)
It is also clear from the Complaint that the proximity of the products is sufficiently close to create a likelihood of confusion. "The proximity factor 'focuses on whether the two products compete with each other[,] ... serve the same purpose, fall within the same general class, or are used together.' " Cartier , 294 F. App'x at 619 (quoting Savin Corp. v. Savin Group , 391 F.3d 439, 458 (2d Cir. 2004) ). Plaintiff alleges that the "industry" learned J Geiger had entered into a manufacturing sales agreement with a third party, and that, in response, "Lutron announced the Palladiom Shading System including a center bracket in September 2017." (Compl. ¶ 52.) The allegation creates an inference that Plaintiff and Defendant are both in the same industry and compete against each other. However, additional factfinding is likely required to determine the relevant marketplace. See Cartier , 294 F. App'x at 619-620.
The remaining factors require a fact-intensive inquiry not suitable for a motion to dismiss. See Eliya , 2006 WL 2645196, at *3, n. 2 ("an application of the so-called Polaroid factors on this motion to dismiss would be inappropriate because it would involve premature factfinding.")
*286 Plaintiff has made sufficient allegations regarding likelihood of confusion to survive this motion.
C. The Motion to Dismiss Count III is Granted
Plaintiff's state law claim for unjust enrichment based on trade dress infringement, however, must be dismissed. Under New York state law, "The theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." Georgia Malone & Co. v. Rieder , 19 N.Y.3d 511, 516, 950 N.Y.S.2d 333, 973 N.E.2d 743 (2012) (internal citations and quotations omitted).
In order to state a claim for unjust enrichment, a plaintiff must allege that "(1) the other party was enriched, (2) at [plaintiff's] expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." Franklin v. X Gear 101, LLC , 17 Civ. 6452 (GBD) (GWG), 2018 WL 3528731 (S.D.N.Y. July 23, 2018), report and recommendation adopted, 17 Civ. 6452 (GBD) (GWG), 2018 WL 4103492 (S.D.N.Y. Aug. 28, 2018) (quoting Mandarin Trading Ltd. v. Wildenstein , 16 N.Y.3d 173, 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104 (2011) ). A claim relying on quasi-contract theory cannot survive if there is no "relationship or connection between the parties that is not 'too attenuated, or evidence of a relationship between the parties that could have caused reliance or inducement." Franklin , 2018 WL 3528731, at *20 (internal citations and quotations omitted). Mandarin Trading Ltd. , 16 N.Y.3d at 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104.
In addition, a plaintiff must allege that "they performed services for the defendant, which caused the defendant's unjust enrichment." Int'l Diamond Imps., Inc. v. Med Art, Inc. , No. 15-CV-4045 (KMW), 2017 WL 2839640, at *10 (S.D.N.Y. June 29, 2017). See also Kaplan, Inc. v. Yun , 16 F.Supp.3d 341, 353 (S.D.N.Y. 2014) ; accord Kaye v. Grossman , 202 F.3d 611, 616 (2d Cir. 2000) ; Franklin , 2018 WL 3528731, at *20 ; Segal v. Cooper , 95 A.D.3d 545, 944 N.Y.S.2d 65, 67 (1st Dep't 2012).
Instead, the Complaint states that Defendant operated with an "undue advantage" and "wrongfully obtained benefits at J Geiger's expense" because it profited from the use of Plaintiff's trade dress without "the expenses incurred by J Geiger." (Compl. ¶ 26.) Plaintiff argues that "Defendant has wrongfully obtained and is wrongfully obtaining a benefit at J Geiger's expense by taking undue advantage and free-riding on J Geiger's efforts and investments and enjoying the benefits of J Geiger's hard-earned goodwill and reputation." (Id. ¶ 27.) Plaintiff does not allege it performed any services for Defendant.
Plaintiff fails to allege a relationship or connection between itself and Defendant. The Complaint alleges only that the parties are competitors. This connection is far too attenuated to state a claim in quasi contract. See Mandarin Trading , 16 N.Y.3d at 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104 ("no indicia of an enrichment that was unjust where the pleadings fail[ ] to indicate a relationship between the parties that could have caused reliance or inducement."). In addition, Plaintiff does not allege that it conferred a direct benefit onto Defendant - only that Defendant profited from the sales of its own product. See Kaplan, Inc. , 16 F.Supp.3d at 353 (failure to allege conferral of a direct benefit in trademark infringement case warrants dismissal of a state law unjust enrichment claim). Plaintiff fails to state a *287 claim for unjust enrichment under New York state law.
CONCLUSION
For the foregoing reasons, Defendant's motion to dismiss Plaintiff's complaint is DENIED as to Count II and GRANTED as to Count III. The Clerk of the Court is directed to remove the motions at Dkt. No. 46 from the Court's list of pending motions.

Pursuant to Fed. R. Civ. P. 41(a)(A)(i), Plaintiff voluntarily dismissed Count I-a patent infringement claim-from its Complaint. (Pl's Notice of Voluntary Dismissal, Dkt. No. 64.) Only Counts II and III remain.

"Prior to the codification of the functionality element by the Trademark Amendments Act of 1999, 5 Pub. L. 106-13 (August 5, 1999), [the non-functionality] element was an affirmative defense in the Second Circuit." Malaco Leaf, AB v. Promotion In Motion, Inc. , 287 F.Supp.2d 355, 363 n. 4 (S.D.N.Y. 2003). (citing Yurman Design , 262 F.3d at 116 ; Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc. , 58 F.3d 27, 31 (2d Cir. 1995) ).