UNITED STATES DISTRICT COURT 
 DISTRICT OF CONNECTICUT 

JAMES CONCANNON, 
 Plaintiff 
 Civil No. 3:21-cv-01678 (JBA) 

 v. , 
 March 15, 2023 

LEGO SDYeSfTeEnMdaSn, tIsNC., and LEGO SYSTEM A/S 

 . 
 RULING ON MOTION TO DISMISS AND MOTION TO SEAL 
Table of Contents 

 I. Background........................................................................................................................................ 4 
 II. Legal Standard ............................................................................................................................. 8 
 III. Discussion ...................................................................................................................................... 8 
 A. Consideration of Documents Outside the TAC ............................................................ 8 
 B. LEGO’s Motion to Seal Exhibit 1 ..................................................................................... 10 
 C. Copyright Infringement Under 17 U.S.C. § 101 (Count 1) ................................... 12 
 1. Implied Non-Exclusive License .................................................................................. 13 
 2. Fair Use ............................................................................................................................... 18
 D.Contributory Copyright Infringement (Count II) and Vicarious Copyright 
 Infringement (Count III) .......................................................................................................... 28
 E.Trade Dress Infringement and Unfair Competition Under 15 U.S.C. § 1125(a) 
 (C ount IV) ...................................................................................................................................... 28 
 1. Description of the Trade Dress .................................................................................. 29 
 2. Nonfunctionality and Secondary Meaning ............................................................ 32 
 3. Likelihood of Confusion ................................................................................................ 36
 4. Overall Assessment on Prima Facie Trade Dress Infringement ................... 42 
 F . Violation of CUTPA Under Conn. Gen. Stat. § 42- 110a, et seq (Count V) ...... 42 
IV. Conclusion .................................................................................................................................. 43
 SUMMARY 

 Plaintiff James Concannon brought suit against Defendant LEGO Systems, Inc. (“LSI”) 
and Defendant LEGO System A/S (“LSAS”) alleging that Defendant LSI produced a LEGO piece 
(the “LEGO Jacket”) in its “Queer Eye – the Fab 5 Loft” Lego play set (the “Fab Five Set”) 
copying a design that Plaintiff painted on a black leather jacket owned by celebrity Antoni 
Porowski (“the Concannon Jacket”). (Third Am. Compl. (“TAC”) [Doc. # 48].) Plaintiff alleges 
copyright infringement by LSI (Count 1), contributory copyright infringement by LSAS 
(Count 2), vicarious copyright infringement by LSAS (Count 3), trade dress infIrdin. gement by 
LSI, (Count 4) and unfair competition in violation of CUTPA by LSI (Count 5). ( ) 
 Defendant LSI moves to dismiss Count 1 on the grounds that it has a valid license that 
permits use of the jacket, or in the alternative, that iptsr iamcati ofancsi ec onstitute fair use. It also 
moves to dismiss Count 4 and 5 for failure to plead a trade dress infringement 
claim, which serves as the basis of Plaintiff’s Lanham Act (Count 4) and CUTPA (Count 5) 
claims. (Mot. to Dismiss [Doc. # 35] at 2.) Defendant LSAS joins Defendant LSI’s motion to 
dismiss Counts 1, 4, and 5, and argues as to Counts 2 and 3 that because Plaintiff has failed 
to plead a claim for direct copyright infringement, the contributory and vicarious copyright 
claims should be dismissed as well. (Supp. Mem. in Support of Mot. to Dismiss [Doc. # 57] at 
2.) 
 For the reasons that follow, the Court DENIES Defendants’ motions to dismiss. 
Defendant LSI’s motion is denied as to Count 1 because it does not show the parties “meeting 
of the minds” necessary to establish the affirmative defense of an implied nonexclusive 
license to use Plaintiff’s design. Defendant LSI’s motion is also denied based on its fair use 
defense because factual issues remain as to the purpose, character, and nature of the 
Concannon and Lego Jackets, and the remaining fair use factors do not weigh in Defendant’s 
favor. Defendant LSI’s motion is denied as to Counts 4 and 5 because Plaintiff has set forth a 
sufficient trade dress definition, and has adequately pled secondary meaning and likelihood 
of confusion to show a plausible claim on which his Lanham Act claim and the CUTPA claim 
are based. Defendant LSAS’ motion to dismiss Counts 2 and 3 for contributory and vicarious 
copyright infringement are also denied because the underlying direct copyright 
infringement claim survives. The Court also DENIES Defendant LSAS’ motion to seal for 
fIa. ilure Btoa ncakrgrroowulnyd t a ilor its sealing request. 
 Plaintiff James Concannon is a “multi-disciplinary artist and designer” who alleges 
that he has “achieved notoriety” as a creator of t-shirts, jackets, and accessories that are 
recognizable because they feature “short, provocative statements in hand-painted, graffiti-
style lettering.” (TAC ¶¶ 2, 19.) He describes this “unique combination of provocative, 
tongue-in-cheek phrases relatinIgd .to pop culture, with hand-painted, graffiti-style lettering” 
as a “hallmark” of his aesthetic. ( ¶ 20.) The “look, feel, and aesthetic” of Plaintiff’s products 
is “consistent,” “recognizable and distinctive[;]” “no other artist or designer Ihda.s released a 
line of clothing containing this unique combination of specific elements.” ( ¶¶ 22, 23.) 
Additionally, Plaintiff alleges that because the products “comment satirically on punk rock 
and pop cuIldtu. re” while being “worn and publicized by celebrities,” they also form “part of the 
culture.” ( ) Plaintiff also receives orders for custom products “featuring Concannon’s 
distinctive Trade Dress”I da.nd customized by “choosing words or phrases that are tailored to 
a customer’s interest.” ( ¶¶ 30-31.) 
 Plaintiff identifies numerous celebrities who have been photographed wearing or 
featuring his work, including “Lady Gaga, Lil WayneI,d S.uki Waterhouse, Jaime King, and punk 
rock icons like Jimmy Webb and the band Death.” ( ¶ 26.) At least one of these celebrities 
made a social media post describing ConcannonI da.s “creating a new underground fashion 
scene with his signature hand-painted” pieces. ( ¶ 27.) Plaintiff maintains that while he 
“sells or gifts his custom pieces,” he “retains the copyrights to his dIde.signs and the Trade Dress 

in order to conduct business and maintain his distinct designs.” ( ¶ 34.) One celeQbureiteyr wEyheo, 
has worn Plaintiff’s works. isI dA.ntoni Porowski, one of the stars of the Netflix series 
produced by ITV America ( ¶ 29.) Netflix requested Plaintiff’s permission for Porowski to 
wear four Concannon products in the show’s first season; Plaintiff signed a release granting 
ITV the rightI dt.o feature the products on the show and in connection with the show’s 
advertising. ( ¶¶ 37, 38.) Through this pIdr.ocess, Plaintiff learned that Porowski “was a fan” 
of his work, and the two became friends. ( ¶ 39.) Over the next few years, Plaintiff provided 
Porowski withQ sueeveerr aEly ae’dsd itional Concannon products; when these products were featured 
on the show, “ producers sought Concannon’s permission and obtained a signed 
release specifyinIgd .the Product that would appear on the show and the nature of the rights 
being granted.” ( ) 
 In 2018, at Porowski’s request, Plaintiff created a custom black leather jacket with the 
words “THYME IS ONId .MY SIDE” painted on the jacket, a “play on Mr. Porowski’s interest in 
food and cooking.” ( ¶¶ 32, 41.) ThIed .artwork embodied on the jacket “is registered with 
tQhuee eUrn Eityeed’s S tates Copyright Office.” ( ¶¶ 41.) The jacket appeared on the first episode of 
 Idf.ourth season, but Netflix and the show’s producers did not seek a release to 
display it. ( ¶ 43.) Although Plaintiff said he was “not disturbed” by the Concannon Jacket’s 
appearance because he “figured this was simply an oversight on Netflix’s part” and was 
“happy to see his work featured on a show” that had previously asked his permission and 
credited him, hIed a.lso maintains that he “never granted Netflix a license to display the jacket 
on the show.” ( ¶¶ 44.) 
 In September 2021, LEGIdO. began marketing its Fab Five Sets, which it began selling on 
October 1, 2021 for $99.99. ( ¶ 48.) Plaintiff alleges that the set contained a piece—the 
LEGO Jacket—that copied “the individual creative elements of the Concannon Jacket” as well 
as the “unique placement, coordination, and arrangement of those individual artistic 
elements,” and his “distinctive Trade Dress—specifically, a tongue-in-cheek phrase 
prominently displayed in graffiti-style lettering on the back of the jacket.” (/d. | 49, 50.) The 
TAC provides an image of the two side by side: 

 ae 4 eS = ON ) 

 1 TY □□ _
 as ocd V4 ao Pin 
 NORE = oy) 
 ee ie “ah er 
 | i "ae ae

 Ek ae uy Me 
 mp * 
 Ee ay Tat 
 als being beticel “aia oe 

 F
 | =

 Id. 

 ( at ¶ 48.) The TAC alleges “[u]pon information and belief” that LEGO System A/S 
and LEGO Systems “jointly conspired to create, advertise, and sell a LEGO set that directly 
copied the Concannon jacket,” as evidenced by a statement from LEGO’s Senior Graphic 
Designer in a promotional video tIhda.t Antoni Porowski “has a really iconic leather jacket that 
we redid in the LEGO version.” ( ¶¶ 46, 54.) According to Plaintiff, neither LSI nor LSAS 
sought PlaIdin.tiff’s permission to use the artwork or Trade Dress or credited him as the 
creator. ( ¶ 53.) The LEGO “Fab Five” set has been created, distributed, and sold 
“throughout the world,” with marketing mIadt.erials including photos and animated videos of 
the LEGO Jacket used to promote the set. ( ¶ 57-59.) 
 Plaintiff alleges that when he learned of the production of the set, he contacted LEGO 
customer service, where he was told that LEGO “loves creators” and was offered a free FabI d5. 
Loft set; when he called back, however, he was told that LEGO does not give out free sets. ( 
¶ 60.) On November 12, 2021, Plaintiff sent LEGO a cease-and-desist letter in which he 
asserted his “intellectual property rights” inId t.he hope that LEGO “would offer to compensate” 
him “or pay him a reasonable royalty”. ( ¶¶ 61-62; Def.’s Mem. Exh. 3 [Doc. # 35-4].) 
Plaintiff registered the “artwork embodied in the Concannon Jacket” with the United States 
Copyright Office on November 26, 2021. (TAC Exh. A, Certificate of Registration [Doc. # 48-
1].) Following the release of the set containing the LEGO Jacket, Plaintiff contends that his 
“business and livelihood have been threatened” because he “relies on the exclusivity and 
distinctiveness of his designs” to sell his products. (TAC ¶ 67.) 
 Plaintiff filed his initial complaint on December 17, 2021, against LEGO A/S and LEGO 
Systems Inc. [Doc. # 1.] An amended complaint was filed on February 15, 2022. [Doc. # 15]; 
a Second Amended Complaint was filed March 29, 2022 [Doc. # 30] following a prefiling 
conference. After Defendant’s Motion to Dismiss was filed on April 22, 2022, Plaintiff filed a 
stipulation seeking permission to substitute LEGO System A/S for LEGO A/S without altering 
 see 

the substantive allegations, ( Stipulation for James Concannon to File a Third Amended 
Complaint [Doc. # 1]), which the Court granted, resulting in the filing of the TAC on June 13, 
2II0. 22 [DLoecg.a #l S4t8a]n. d ard 
 “To survive a [12(b)(6)] motion to dismiss, a complaint must contain sufficient 
fSaacrtmuaiel nmtoa vtt. eUrn, iateccde Spttaetde sas true, to state a claim to relief that is plAasuhscirboleft ov.n I qitbsa lface.” 
 , 678 F.3d 147, 152 (2d Cir. 2012) (quoting , 556 
U.S. 662, 678 (2009).) The “plausibility” requirement is “not akin to a probability 
requirementI,”q bbault it “asks for more than a sheer possibility that a defendant has acted 
unlawfully.” , 556 U.S. at 678. In oBtehlle Ar twlaonrtdics ,C ao vrpal. ivd. Tclwaoimm bfolyr relief must cross “the line 
between possibility and plausibility.” , 550 U.S. 544, 557 (2007). 
The Court mHuesrtn “aancdceezp tv .a Us ntirtueed Satlal tfeasctual allegations and draw from th em all reasonable 
inferences.” , 939 F.3d 191, 198 (2d Cir. 2019).Although it is “not 
ride.q, uired to credit conclusory allegations or legal conclusions couched as factual allegations,” 
 motions to dismiss “assess the legal feasibility of a complaint” and are not the pOlnactaer tioo 
“Taesascahye trhs'e P wenesiigohnt Polfa tnh Be de. vvi.d Teenvcae P whahricmh. Imndiguhst. Lbted .o, ffered in support” of the merits. 
 Ryder Energy Distribution Corp. v. Merrill Ly4n3c2h FC.o Smumppo.d 3idti e1s3 I1n,c 1.51 (D. Conn. 2019)
(quoting , 748 F.2d 774, 779 
(II2Id. Cir.D 1i9sc8u4s))s.i on 
 A. Consideration of Documents Outside the TAC 

 Plaintiff objects to Defendants’ attempt to introduce ExhiQbuite 1er, wEhyiec h is the licensing 
agreement between Scout Productions Inc. (which produces for Netflix) and 
Defendant LSAS. (Ex. 1 [Doc. # 35-2].) “[A] district court errs when it ‘consider[s] affidavits 
and exhibits submitted by’ defendants or relies on factual allegations contained in legal briefs 
 See Friedl v. City of New York 

or memoranda in ruling on a 12(b)(6) motion to dismiss.” Kopec v. Coughlin , 210 
F.3d 79, 83-84 (2d Cir. 2000) (alteration in original) (quoting , 922 F.2d 
152, 155 (2d Cir. 1991). However, courts can consider “extrinsic material that the complaint 
incorporates by Lrievfeelyre vn. cWe, AtFhRaAt iIsn vin. tAedgvriaslo rtoy Gthrpe .,c Ionmcplaint, or of which courts can take 
judicial notice.” ., 6 F.4th 293, 305 (2d Cir. 2021A)T. SAI 
dCoomcummce'nnst, iIsn icn. tve. gSrhaal ator tFhuen cdo, mLtpdlaint if it was “possessed by or known to the plaintiff,” 
 ., 4N93ic oFs.3iad v8. 7A, m98a z(o2nd. cCoimr. , 2I0n0c7), and the “complaint relies 
heavily upon its terms and effect,” ., 834 F.3d 220, 230 (2d Cir. 
2016) (internal quotation marks omitted). 
 Defendant argues that “[t]he License Agreement is properly incorporated into the 
 1 
Second Amended Complaint by reference because Mr. Concannon relies on it as the basis of 
his willful infringement claim, . . . and the existence of the License Agreement was integral to 
and relied on in framing the Second Amended Complaint.” (Defs.’ Mem. at 4 n.6.) Plaintiff 
counters that the TAC does not reference the agreement nor do its claims implicitly rely upon 
it. (Pl.’s Opp’n at 5 n.2.) Plaintiff is correct; the TAC references Defendants’ attorneys’ 
representations about the existence of a sublicensing agreement between Netflix and 
Defendants, but not the agreement itself. (Comp. ¶ 63.) Neither the terms or effects of the 
agreement are relied on by thQeu TeeArC E, ywehich concerns the existence of licenses (or lack 
thereof) betwQeueene rP Elayientiff and ’s production company or Plaintiff and LEGO, not 
between the production company and LEGO. Nor could the TAC rely on the terms 
of the agreement, because Plaintiff has never seen a copy of the agreement. (Pl.’s Opp’n at 5 

1 
 Defendant’s Motion to Dismiss was filed when the Second Amended Complaint was the 
operative complaint and makes reference to it as such; the Third Amended Complaint is now 
the operative complaint. The only difference is the substitution of one of the Defendants; the 
substantive allegations are identical. 
n.2.) Because the TAC neither references nor relies on the specific contents of Exhibit 1, the 
Court declines to consider it in deciding the motion to dismiss. 
 DefendIda.nt also seeks to submit the LEGO set (Ex. 2 [Doc. # 35-3]), the set’s building 
instructions ( ), and the cease and desist letter sent by Plaintiff’s counsel to the LEGO group 
(Ex. 3 [Doc. # 35-4]) as exhibits to its motions to dismiss and for the Court to consider them 
as materials referenced by and thus incorporated by the complaint. Plaintiff does not object 
to consideration of any of these seexeh, ieb.git.s. The LEGO set itself and the cease and desist letter 
are both referenced in the TAC ( , Compl. ¶¶ 4-7, 61), and so will be considered by the 
Court. However, the building instructions in Exhibit 2, which apparently confirm that Mr. 
Porowski partnered with LEGO and granted them a non-exclusive implied license in his 
likeness, are not referred to in the TAC. Defendant argues that the TAC links to a website that 
contains the building instructions; the building instructions are also contained in the 
physical set itself. (Defs.’ Mem. at 14 n.14; TAC ¶ 56.) However, the TAC does not specifically 
reference the material in the instructions, and the link in the TAC Defendant references does 
not link directly to the building instructions, but rather requires the viewer to click two 
additional links to find it. Based on these facts, the instructions are not referenced in the 
“four corners” of the TAC, nor does the TAC rely “heavily” on the contents of the building 
instructions such that they are “integral” to Plaintiff’s arguments. The building instructions 
will notB b. e LcEoGnsOid’se Mreodt iino nth teo eSveaalul aEtxiohnib oitf D1 efendant’s motion. 
 Defendant LSI has moved to seal the entirety of Exhibit 1 of its motion to dismiss, and 
the portions of its motion that quote the agreement. (Defs.’ Mot. to Seal. [Doc. # 36] at 1.) 
This District’s Local Rules state that to grant a motion to seal, the Court must make 
“particularized findings demonstrating that sealing is supported by clear and compelling 
reasons and is narrowly tailored to serve those reasons.” L. R. Civ. P. (5)(e)(3). This high 
standard is consistent with the fact that “the normal burden upon the proponent of a 
protective order to establish good cause for protection is significantly enhanced withSt raensdpaercdt 
tInov j.u Cdhicairatle droedcu, mInec.n Vts. , Faisn t. oI nwdhuisc. hR ae gcuolm. Amuothn. ,l aIwnd p. resumption of access attaches.” 
 , 347 Fed. Appx. 615, 616 (2d Cir. 2009) 
(internal citations and quotation marks omitted). As such, “a judge must carefully and 
skeptically review sealing requesVtisd etoo Soinftswuarere tDheaatl etrhs eArses orce. av.l lOy riiosn aPnic tuerxetrsa, Coordrpinary 
circumstance or compelling need.” ., 21 
FT.r3adv e2l4e,r 2s 7In (d2edm C. iCr.o 1. 9v9. E4x)c. “a[lBib]ularn Rkeeitn sseuarlainncge o Cf oernptire documents . . . is generally disfavored.” 
 ., No. 3:11-CV-1209, 2012 WL 13029590, 
at *3 (D. Conn. Apr. 13, 2012). 
 Defendant LSI argues that “[t]he License Agreement contains confidential 
information of third parties relating to the licensing of intellectual property rights, including 
the terms of said license, financial and bank account information, and information pertaining 
to insurance policies, that, if disclosed to the public, and competitors, would result in a 
competitive disadvantage.” (Mot. to Seal at 2.) “Documents falling into categories commonly 
sealed are those containing trade secrets, confidential research and development 
iCnufmorbmeraltaionnd, Pmacakriknegt iCnogr pp. lva.n Ms, ornetvsaenntuoe Cionformation, pricing information, and the like.” 
 ., 184 F.R.D. 504, 506 (E.D.N.Y. 1999). However, 
“non-trade secret but confidential business information” is “not entitled to the same level of 
protection from disclosure as trade secret information,” and “[b]usiness documents that are 
secret or that might cause adverse publicity if disclosed do not automatically warrant a 
protective order, and broad allegations of harm unsubstantiated bGyr asypseocnif vic. Geexna.m Eplelce.s C oor 
articulated reasoning fail to satisfy the standard for nondisclosure.” ., 
No. 3:13CV1799 (WWE), 2017 WL 923907, at *1 (D. Conn. Mar. 7, 2017). 
 Defendant LSI fails to show by clear and convincing evidence that the Court should 
disregard the presumption against blanket sealing. There are certain portions that fall within 
presumptively sealable categories, such as personal identifying information, and the terms 
of “confidential trademark licensing agreements” are also subject to sealing to pRruobtiekc'st 
cBormanpda Lntieds. vf.r Folmam bbeeinagu ,d Iinsca.dvantaged “in negotiating future licensing agreements.” 
 , No. 17CV6559PGGKHP, 2021 WL 1085338, at *1 (S.D.N.Y. Mar. 
22, 2021). However, Defendant has not “narrowly tailored” its sSeeaeli indg. request to such 
categories, instead seeking a blanket sealing of the entire document. (initially denying 
the motion to seal because the parties “had vastly over-designated documents for redaction 
and sealing,” and granting the motion only after revised motions were filed). 
 Defendant also has not presented a compelling reason to seal the portions of the 
licensing agreement quoted in their motion to dismiss; the quoted portions of the agreement 
simply state the subject of the agreement or terms that do not facially contain “trade secrets” 
or competitive information. Defendant fails to explain how the disclosure of these specific 
terms, some of which are highly specific to the Lego set at issue and seem unlikely to come 
up in “future licensing agreements,” would cause competitive disadvantage were it to be 
disclosed to the public. 
 The Court denies the motion to seal [Doc. # 36] based on the above. Defendant LSI 
may file a motion with a properly redacted Exhibit 1 and supporting memorandum if it does 
not wish for the entire contents to be part of the public record. Any such motion to seal shall 
be filedC w. itChoinp y1r4i gdhaty Isn offr tihnigse rmuleinngt. U nder 17 U.S.C. § 101 (Count 1) 
 In order to establish a claim of copyright infringement, the plaintiff must prove “(1) 
ownershipF oeifs at vPaulbidli ccaotpioyrnisg, hItn, ca.n vd. (R2u)r caol pTyeilnegp hoof ncoe nSsetritvuiceen tC eolements of that work that are 
original.” ., 499 U.S. 340, 361 (1991). 
 2 
Defendant LSI assumes for purposes of this motion that Plaintiff can establish actual 
copying and substantial similarity but argues that the copying was not illegal based on two 
affirmative defenses: (1) Defendant had an implied non-exclusive license to use the 
Concannon jacket and its likeness, and (2) because the LEGO Jacket constitutes fair use. 
(Def.’s Mem1.. atI m9.p) l ied Non-Exclusive License 
 “While a complaint can be dismissed for failure to state a claim pursuant to a Rule 
12(b)(6) motion raising an affirmative defense if the defense appears on the face of the 
complaintC, atphiet oclo Rmecpolardinst, Iintsce. vlf. MmPu3stt uensetsa, bLlLisCh, the facts necessary to sustain defendant's 
defense.” No. 07 Civ. 9931(WHP), 2009 WL 3364036, 
at *3 (S.D.N.Y. Oct. 16, 2009). Defendant is not precluded from raising an affirmative defense 
at this stage but must make its case based on the facts of the TAC, without reliance on 
extrinsic evidence. As discussed below, it fails to do so. 
 “Where the dispute turns on whether there is Taa sliicnei nvs. eN eawt aYlol,r tkh Tei mbuers,d Ceon is on the 
alleged infringer to prove the existence of the license.” ., 206 F.3d 
161, 171 (2d Cir. 2000). “[U]nder federal Glarwah, naomn evx. cJalumsievse, licenses may . . . be granted orally, 
or may even be implied from conduct.” 144 F.3d 229, 235 (2d Cir.1998). 
However, as reflected by the parties’ positionPss iahto oyroas lv a. Prgeuamrseonnt E, d“[utc]h.,e law in the area of 
implied licenses shows a measure of conflict.” Inc., 855 F. Supp. 2d 
103, 119 (S.D.N.Y. 2012). Defendant’s counsel maintained that so long as Plaintiff delivered 
the jacket to Mr. Porowski, a celebrity, with the understanding that he was going to wear it 
in public and did not impose restrictions, the Court can find an implied license; Plaintiff, on 

2 See 
 Defendant LSAS joins all Defendant LSI’s arguments as to Counts I, IV, and V in full and 
makes no additional arguments for dismissal as to these counts. ( Def. LSAS’ Supp. Mem.) 
As such, any reference to “Defendant” singular is to Defendant LSI unless otherwise specified. 
the other hand, contends that a Court can only find an implied license if the artist has the 
knowledge and intent that the work will be used for some other sApBecKiCfiOc pMuurspico,s Ien. c. v. Sagan
 The Second Circuit’s most recent case on implied licenses, , 
50 F.4th 309, 320 (2d Cir. 2022), recognized two potential tests to determine whether an 
implied license existed: “a narrow test, finding an implied license only where one party 
‘created a work at [the other's] request and handed it over, intending that [the other] copy 
and distribute it,’” and “a more permissive test by which consent may be inferred based on 
 3 
silence where the copyright holder knows of the use and encourages it.” These two potential 
tests track the positions taken by Plaintiff’s and Defendant’s counsel at oral argument, 
respectively. Unfortunately, there is no definitive resolution since the Second Circuit 
declined to adopt a particular test, holding only that either test for an implied license 
rIde.q uires “a meeting of the minds between the parties to permit the particular usage at issue.” 

 Defendant’s argument as to the existence of an implied license requires several 
inferential leaps. First, Defendant argues that because Plaintiff added the copyrighted design 
elements to Mr. Porowski’s black leather jacket for free before returning it to him, and 
because he did so “intending that Mr. Porowski copy and distribute it,” an implied license 
existed. (Def.’s Mem. at 5-6.) Specifically, Defendant asserts that the facts demonstrate 
Plaintiff conveyed a non-exclusive license to Mr. Porowski to use the Concannon Jacket to 
“use as he wished, including as a part of his likeness” because Plaintiff knew that Mr. 
Porowski was a celebrity and thus “liQkeuleye rt oE yaeppear” in public with the jacket, never 
protested Mr. Porowski’s appearance on Season 3 and 4 wearing the jacket despite 
the absence of any written authorization, and never asked Mr. Porowski to limit the “display 

3 
 Unless otherwise indicated, internal citations, quotation marks, and other alterations are 
omitted throughout in text quoted from court decisions. 
 Queer Eye Id. 

or depiction” of the Concannon Jacket either before or after its appearance on . ( 
at 12-13.) This constitutes the “meeting of the minds” in Defendant’s view, and once the 
implied license was granted to Mr. Porowski, he was free to sublicense it as he wished. 
Second, Defendant contends that Mr. Porowski in turn granted an implied non-exclusive 
license in his liQkeuneeers sE, yinecluding the Concannon Jacket, to Scout ProductioQnuse, etrh eE yceompany 
that produces for Netflix, because Mr. Porowski appeared in and in 
 4 
promotional media wearing the Concannon jacket. (Def.’s Mem. 7-8.) 
 Plaintiff responds that there was no “meeting of the minds” because “through their 
previous business interactions,” Plaintiff expected that Netflix “would contact him” when a 
Concannon product was featured on the show and in connection with advertising. (PQlu.’ese Mr eEmye. 
at 11-12.) Although he did not object to the display of the Concannon Jacket on the 
show without his permission, Plaintiff argues that he was unaware of “collaboration with 
Defendants”I adn. d “had no intention of licensing the Concannon Jacket to be replicated in the 
LEGO Set.” ( at 11-12.) To find an implied license here, Plaintiff asserts, would mean that 
“any celebrity gifted with a designer clothing item would have the unrestricted right to 
recreate anIdd distribute copies of the clothing item, since it would be considered part of their 
likeness.” ( .) 
 The Court does not currently have sufficient factual information on the face of the 
complaint to determine whether the license existed as required for an affirmative defense, 
regardless of which test for finding implied license the Court applies. While Plaintiff did see 

4 
 In addition, Defendant argues that Mr. Porowski’s grant of a non-exclusive license for his 
likeness extended to the LEGO group of companies as well based on a quote in the building 
instructions from Mr. Porowski referring to the Fab Five LEGO set as a “special partnership”, 
and because in Exhibit 1, the “License AgreeImd.ent”, Scout Productions grants LEGO 
permission to use Antoni Porowski’s likeness. Both documents, as explained above, will not 
be considered in evaluating Defendant’s motion. ( ) 
 Queer Eye 

the appearance of the jacket on i anntedn sduebdsequently choose not to take further action. 
that alone is not enough to infer that he for it to be copied and distributed, or that 
he and Mr. Porowski had any common understanding of how the jacket would be used. 
Plaintiff alleges that he did not, and that in particular, he had no reason to believe based on 
his prior dealings with Mr. Porowski and Netflix that the Concannon Jacket would be used 
by LEGO to create a new product. Taking Plaintiff’s factual allegations about his own 
understanding and knowledge as true, the Court cannot conclude that there was a “meeting 
of the minds” on how the Concannon Jacket would be used, and dismissal on this basis is 
unwarranted. Solid Oak Sketches, LLC v. 2K 
Games, DInecfendant attempts to evade this conclusion., relying on Solid Oak Sketches 
 ., 449 F. Supp. 3d 333, 346 (S.D.N.Y. 2020) The plaintiffs in were 
the tattoo artists that had designed and inked the tattoos of several NBA players; the NBA 
players in turn granted licenses to their likenesses to defendIdan. t, a video game company, so 
that the company could portray the NBA players in a game. Because the depiction of the 
NBA players included digital depictions of the taItdto. os, plaintiffs asserted that the game 
infringed on their copyrights to the tattoo designs. at 339. The court applied a version of 
the stricter test for implied license, finding that (1) the NBA players requested the tattoos to 
be created, (2) the tattoo artists created and delivered the tattoos, (3) the tattooists 
“intended” that the players would “copy and distribute” the tattoos as “elements of their 
likenesses” based on their knowledge that the NBA players “were likely to appear in public, 
on television, in commercials, or in other forms of media,” and (4) thIed .a rtists never requested 
that the NBA players limit “the display or depiction” of the images. at 346. Based on these 
facts, which were part of the “the undisputed factual record” at summary judgment, the court 
held that NBA players had been granted an implied nonexclusive license to feature their 
tattoos as part of their likeness bIyd .p laintiffs, which included the right to then sub-license the 

tattoos as part of their likeness. Solid Oak Sketches. 
 The facts of this case, however, are distinguishable from There, the 
tattoo artists’ own declarations plainly stated that theIyd .“ intended the Players to copy and 
distribute the Tattoos as elements of their likenesses.” at 346. Here, Plaintiff has made no 
 5 
such admission, nor can his consent be implied from his silence alone. Further, asS oPlliadi nOtaifkf 
oSkbestecrhveess , a tattoo cannot be removed from one’s body, and thus the artists in 
 were necessarily recognizing that imprinting a tattoo’s design onto a public figure 
meant that the tattoo would appear wherever that public figure did. (Pl.’s Mem. at 13.) On 
the other hand, Mr. Porowski was featureQd uweeear rEinyeg multiple items of clothing from Plaintiff 
alone throughout the course of the show , and Defendant’s Lego set also provides 
an alternative outfit piece for Mr. Porowski—a plain white t-shirt—the interchangeability of 
which necessarily demIdo.nstrates that the Concannon jacket is not an irremovable part of Mr. 
Porowski’s likeness. ( ) Further, even if the facts in the TAC supported Defendant’s claim 
of an implied license between Mr. Porowski and Plaintiff, without the building instructions 
and license agreement, the Court also cannot determine whether LEGO was ever granted a 
license to the Concannon Jacket by anyone with an alleged implied license of their own. 
 Finally, regardless of whether there was an implied license at the time tSheee sOertt wiz avs. 
manufactured and distributed, it has been revoked by the filing of this lawsuit. 
 Alexander v. Take-Two 
5Interactive Software, Inc. 
 At oral argument, Plaintiff’s counsel cited in further support 
 , 489 F. Supp. 3d 812, 820 (S.D. Ill. 2020), a case in which the court 
denied a motion to dismiss where the record did not make clear whether Plaintiff, a tattoo 
artist, discussed the scope of any implied license, such as permission to copy, distribute, and 
sublicense, with the recipient of the tattoo. While the Court notes that counsel did not cite 
this case in her briefing, it nevertheless provides a persuasive illustration of why implied 
licenses are ill-suited for resolution on a motion to dismiss absent a clear license contained 
in the complaint. 
Guitian Music Bros 
Ortiz ., No. 07 CIV. 3897, 2009 WL 2252107, at *4 (S.D.N.Y. July 28, 2009). In 

 , the court found that “Plaintiff revoked any license that may have existed between him 
aIdn. d Defendants” by instituting a lawsuit because implied licenses are revocable by definition. 
 The court rejected the affirmative defense of implied licensing on that basis becauIdse. the 
defendants “continued distribution and sale” of the product after the action was filed. The 
same is true here—Plaintiff alleges in the TAC that he has not been compensated for use of 
his design, and by filing this action, Plaintiff has revoked any implied licensen othwa t may have 
existed prior to the lawsuit. As such, Defendant cannot show that there is an implied 
license, and as Plaintiff has alleged that distribution of the LEGO set continues, he has 
plausibly alleged a copyright infringement claim. 
 The2 m. oFtiaoinr Utos de i smiss Count 1 based on the existence of an implied license is denied. 
 The fair use doctrine “permits and requires courts to avoid rigid application of the 
copyright statute w Chaemnp, boenl l ov.c Acacsuifof–nR, oits ew Mouuslidc , Isnticf.l,e the very creativity that the law is 
designed to foster.” 510 U.S. 569, 577, 114 S.Ct. 1164, 127 
L.Ed.2d 500 (1994). “In determining whether the use made of a work in any particular case 
is fair use, courts consider the following four factors enumerated in the Copyright Act: 
 (1)the purpose and character of the use, including whether such use is 
 of a commercial nature or is for nonprofit educational purposes; 

 (2) the nature of the copyrighted work; 

 (3)the amount and substantiality of the proportion used in relation to 
 the copyrighted work as a whole; and 

 (4)the effect of the use upon the potential market for or value of the 
 Arrow Prodcso.,p LyTriDg.h vt.e Wd ewinosrtke.”in Co. LLC 

 , 44 F. Supp. 3d 359, 367 (S.D.N.Y. 2014). “The 
ultimate test of fair use is whether the copyright law's goal of promoting the Progress of 
SBclaienncche v a. nKdo ounsseful Arts would be better served by allowing the use than by preventing it.” 
 , 467 F.3d 2id4,4 , 251 (2d Cir. 2006) “The determination of fair use is a mixed 
question of law and fact,” andT CsAo T“[ecl]eovuisritosn m Coorspt .f vr.e MquceCnotllluym address a proffered fair use 
defense at summary judgment.” , 839 F.3d 168, 178 (2d Cir. 
2016). Reserving the question for summary judgment is particularly appropriaLtaeC whahpeenl lteh ve. 
F“reenctoyrd is insufficient to make such a fact-intensive ruling as a matter of law.” 
 , 812 F. Supp. 2d 434, 448 (S.D.N.Y. 2011). Courts should only grant motions to dismiss 
based on a faMir auys ev. dSeofneyn Mseu wsich eEnn t“md’itscovery would not provide any additional relevant 
iAnrfroorwm aPtrioodnu.”c tions, Ltd. v. Weinstein Co, 399 F. Supp. 3d 169, 188 (S.D.N.Y. 2019) (quoting 
 ., 44 F. Supp.3d 359, 368 (S.D.N.Y. 2014)). However, 
while the Second Circuit has cautioned that the “fact-driven nature of the fair use 
determination suggests that a district court shouWldr ibgeh t cva. Wutaiorunse”r Bwoohkesn, Incco.,nsidering 
dismissing a claim based on fair use in advance of trial, 953 F.2d 
731, 735 (2d Cair. . 1P9u9r1p)o, sthee a Cnodu Crth iasr naoctt eprr ecluded from doing so. 

 The first factor asks whether the “new work merely ‘supersede[s] the objects’ of the 
original creation, or instead adds something new, with a further purpose or different 
character, altering the first with new expression, meaning, or meCsasmagpeb .e l. l., in other words, 
whether and to what extent the new work is ‘transformative.’” , 510 U.S. at 579. 
While not an absolute prerequisite for fair use, whether the work is transformative is aIdn. 
inquiry that lies “at the heart of the fair use doctrine's guarantee of breathing space.” 
Several factors the court can consider in evaluating whether the work is transformative are 
“(i) whether the two works have different purposes, (ii) the size of the reproductions, (iii) 
whether the expressive valueS oolfi dt Ohea kr Sekpertocdhuesc,ed material is minimized, anBdil l (Givra) htahme 
proportion of copied material.” 449 F. Supp. 3d at 347 (citing 
Archives v. Dorling Kindersley Ltd 

 ., 448 F.3d 605, 611 (2d Cir. 2006)). The inquiry for 
determining the work’s purpose is an objective one that considers how the Defendant’s use 
O“m'Naeyi l rve. aRsaotnaajkbolyw sbkei perceived without concern for the [Defendant’s] subjective intent.” 
 , 563 F. Supp. 3d 112, 129 (S.D.N.Y. 2021). 
 Defendant argues that the LEGO Jacket is analogous to the deSpoliicdt iOona ko Sf kbeatsckheetsb. all 
players’ tattoos in a video game, which was found transformative in As 
the court explained, the use of “exact copies of the Tattoo designs” was for the purpose of 
“accurately depict[ing] the Players,” while the original creation of tShoeli dta Ottaoko sS kwetacsh efos,r the 
purpose of the players “express[ing] themselves through body art.” 449 
F. Supp. 3d at 347. Defendant argues that here, Plaintiff created the jacket as “a means of Mr. 
Porowski’s self-expression,” whereas Defendant’s purpose for the LEGO Jacket was “to most 
accurately depSioclti”d Othaek lSikkeetncehsess of Antoni Porowski. (Def.’s Mem. at 21.) Plaintiff argues, 
however, that is inapposite because Defendants “could have portrayed Mr. 
Porowski’s likeness without copying the Concannon Jacket” if their purpose was only to 
accurately recreate him, and that Defendant’s purpose was thus not to accurately portray 
Mr. Porowski’s likeness, but to recreate the Concannon Jacket to “benefit from the 
associaStioolnid w Oitahk Cso nSckaentnchoens’’s trademark.” (Pl.’s Mem. at 18, 20-22.) 
 conclusion that accurately depicting a subject can be 
transformative where the purpose of the original work was expressive should be interpreted 
narrowly in light of the Second Circuit’s note that courts have often “declined to find a 
transformative use when the defendant Bhalasn dcohn ve. nKoo monosre than find a new way to exploit the 
creative virtues of the original work.” , 467 F.3d 244, 252 (2d Cir. 2006) 
(citing cases). Plaintiff argues that Defendant has done exactly that by simply exploiting the 
creative values of the jacket by recreating it in a different form. Choosing a new medium and 
changing a few elements also do not constitute transformation; “taking ‘the heart of’ a 
copyrCigahmtepdb ewll ovr. kK,o eovnesn if the taking is quantitatively insubstantial, militates against fair 

use.” , No. 91 CIV. 6055 (RO), 1993 WL 97381, at *3 (S.D.N.Y. Apr. 1, 1993) 
(holding that modifying a few elements from the original product, a picture, was not enough 
to render the infringing product, a sculpture, transformative when the “central subject 
matter” was the same.) 
 Here, without materials such as affidavits or depositions to draw on, it would be 
premature for the Court to decide whether Defendant’s purpose was accurate portrayal of 
Mr. Porowski, exploitation of the original work’s values, or something else. The opeSno lnida tOuarke 
oSkf etthceh eqsu, estion becomes especially clear because unlike the tattoos ant oits sue in 
 the LEGO Jacket “includes designs featuring various elements featured” on the 
Concannon Jacket, which Defendant asserts was done for the purpose oCfo smuppparoer ting its own 
marketing campaign rather than to “accurately depict” Mr. Porowski. ( Def.’s Mem. 
at 16 (explaining that the LEGO Jacwkietth “includes designs featuring various elements” not 
featured on the Concannon Jacket) Def.’s Mem. at 21 (explaining that it was trying to 
“most accurately depict” Antoni Porowski through inclusion of the Concannon Jacket.)) 
Defendant’s counsel maintained at oral argument that there is no inconsistency between 
customizing the Lego Jacket and accurately depicting Mr. Porowski; however, whether those 
two purposes are consistent and whether one, both, or neither should be credited is better 
decided with the benefit of a fully developed record. 
 Defendant also argues that the LEGO Jacket is an “inconsequential portion” of the Fab 
Five set since there are two torso elements for Mr. Porowski’s minifigure and six Minifigures 
in total, and the size of the LEGO Jacket is a fraction of the size of the Concannon Jacket. (Def.’s 
Mem. at 21; Def.’s Reply at 6.) In addition to somewhat blurring the lines of analysis between 
the “purpose and character” factor andS othlied “Oaamko Suknett cahneds , substantiality” factor, Defendant’s 
argument misses the mark. While as in the size of the jacket reproduction 
 impact 
is significantSloyl irde dOuacke Sdk efrtcohme sthe original, it was the of the size reduction that 

mattered in , rather than the mere fact of it. As the court explained, the 
reduction in size made the tattoos “difficult to observe” because they were “too small and 
distorted for game users to eSvoelind rOeacko gSkneiztech,”e tsh, us reducing the likelihood that the purpose 
had been an expressive one. 449 F. Supp. 3d at 348. The reduction in size 
of the LEGO Jacket, on the other hand, does not make the individual design elements difficult 
to observe; to the contrary, a simple visual inspection of the LEGO Jacket allows for easy 
identification of each design element. Rather than being “infrequently and only imprecisely 
observed,” the jacket is placed on the torso of one of the “Fab Five” that the set features, and 
the marketing materials for LEGO specifically stated thSaot liitd w Oaask b Sekinetgc huesse d for its association 
with Antoni Porowski and its “iconic” status, unlike in where the tattooed 
players were only three of 400 players and comprised “.000286% to 000431%” of the total 
game data, the “particulars of the Tattoos” were not observable and were displayed only in 
concert with “myriad other auditory and visual elemenItds”. meant to simulate an actual NBA 
game, and the tattoos were not featured in advertising. at 348. 
 Finally, in determining the nature of an alleged infringing work, courts also consider 
whether the work is commercial in nature. If the use is not transformative, the “question 
wOnh eDtahveirs tvh. eT hnee Gwa ups, eIn ics. ,commercial [] acquires an importaans caem ite nddoeeds not have” otherwise. 
 246 F.3d 152, 175 (2d Cir. 2001), (May 15, 2001). “The 
crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary 
gain but whether the user stands toH parropfeitr f&r oRmow e xPpulboliitsahteirosn, Ionfc .t vh. eN caotipoynr Eignhtteerds material 
without paying the customary price.” ., 471 U.S. 
539, 562 (1985). Rather than arguing that the LEGO Jacket is not commercial in nature, 
Defendant instead contends that the commercial nature aspect of the first prong should be 
given limited weight because the LEGO Jacket is merely “incidental” to the commercial value. 
(Def.’s Mem. at 21.) Plaintiff argues to the contrary that Defendants are a “commercial 
business motivated by profits,” and used “the popularity of cultural pieces like Queer Eye 
and the Concannon Jacket toS osleidll Othaeki rS pkreotcdhuecst’s .” (Pl.’s Mem. at 23.) 
 Defendant relies on explanation that the commercial nature was 
incidental because “consumers do not buSyo lNidB OAa 2kK S kveidtcehoe sg ames for the tattoos on LeBron 
James, Eric Bledsoe, or Kenyon Martin.” at 348. Here, however, Plaintiff 
has alleged that Defendants “initially attracted and secured consumers through their act of 
infringement,” including through advertisements that prominently feature the LEGO Jacket. 
(TAC at ¶ 58, 59.) Whether Defendant intended to use the LEGO Jacket specifically to attract 
customers, what profits it has earned based on the inclusion of the LEGO Jacket in the set 
that it would not otherwise have made, and whether there are customers who bought the set 
specifically because it had a product resembling or copying the Concannon Jacket, are 
questions that cannot be resolved only on an analysis of the TAC. 
 Defendant has failed to establish that the purpose and chaSreaec tOe'rN feaicltor weighs in its 
favor. This alone would be enough to deny its motion to dismiss. , 563 F. Supp. 3d 
at 131 (denying summary judgment where reasonable jurors could disagree as to whether a 
work was transformative.) However, open questions also remain as to the following three 
factors that webi.g hN aagtauinrest o gfr Caontpiynrgi ag hmteodti oWn otork d ismiss, as discussed below. 
 The second factor—the nature of the copyrighted work—“calls for recognition that 
some works are closer to the core of intended copyright protections than others, with the 
cCoanmspebqeulel,n ce that fair use is more difficult to establish when the former works are copied.” 
 510 U.S. at 586. “[C]reative expressIdio. n for public dissemination falls within the 
core of the copyOring hDta'sv ips,r otective purposes.” However, this factor “is rarely found to be 
determinative.” 246 F.3d at 175. 
 Plaintiff’s copyrighted work—handpainted design elements on a leather jacket—has 
the “nature of an artistic creation” that falls within the core protected purposes at the heart 
of copyright. Defendant acknowledges that the Concannon Jacket’s design is expressive but 
asserts that “the purpose of the Antoni Minifigure Figurine is factual, transformative, and . . . 
to accurately recreate Mr. Porowski’s likeness.” (Def.’s Mem. at 22.) As discussed above, 
whether the purpose and character of the work are transformative cannot be resolved at this 
stage and neither can this factor be properly weighed without a more fulsome record of the 
purpose behincd. DAefmenoduanntt ’asn cdre Sautibosnt aanntdi adliisttyr i bution of the LEGO Jacket. 
 Defendant argues that it did not copy the Concannon Jacket in its “entirety” for five 
reasons: (1) the LEGO Jacket includes an a “LEGO Minifigure figurine head” and a globe that 
are not part of Plaintiff’s copyright; (2) the LEGO Jacket has a one dimensional “yang” symbol 
as opposed to the Concannon jacket’s three-dimensional ying-yang pin, and four safety pins 
rather than eight; (3) the peace sign on the LEGO Jacket uses different placement, colors, and 
elements than the peace sign on the Concannon Jacket; (4) the text “REBUILD THE WORLD” 
on the back of the LEGO Jacket differs from the phrase “THYME IS ON MY SIDE”; and (5) the 
designs on the sleeves of the Concannon Jacket, and the hands and chain design on the lower 
right, are not on the LEGO Jacket. (Def.’s Mem. at 17-18.) It further asserts that “any similarity 
was necessary to effectuate the trIadn.sformative purpose of creating a realistic Minifigure 
figurine version of Mr. Porowski.” ( at 17.) 
 Plaintiff maintains that Defendants “could have portrayed Mr. Porowski’s likeness 
without copying the Concannon Jacket” through use of other clothing and accessories worn 
by Mr. Porowski that would be recognizable. (Pl.’s Mem. at 20.) Instead, Plaintiff contends 
that Defendants “chose to use the entire design of the Concannon Jacket,” making “no attempt 
to obscure the borrowed elements” and featured the jacket “in all advertising campaigns 
 Id. 

related to the LEGO Set.” ( ) Plaintiff also maintains that Defendant’s attempt to compare 
elements separately is unavailing because his copyright extends to “the overall aestheticId o.f 
the work and cover[s] the placement and overall composition of the Concannon Jacket.” ( ) 
 In Defendant’s fourth argument in defense of its use of the phrase “REBUILD THE 
WORLD” on the back of the LEGO Jackeste, eit references LEGO press release about the purpose 
of its “Rebuild the World” campaign ( Def.’s Mem. at 18) that is neither mentioned nor 
referenced in the TAC. The same goes for Defendant’s argument about its purpose for 
“inclusion of [] elements embodying world peace” and “building” such as the yang symbol, 
peace sign, and safety pins; whether those elements are indeed “central to the LEGO Group 
of Companies’ Rebuild the World Campaign” cannot be established except through reliance 
on materials outside the TAC. 
 Defendant’s remaining Saorgliudm Oeankt s Sakse ttcoh heosw individual elements of the two jackets 
differ are not supported by . The amount and substantiality of the 
Concannon Jacket elements used by the LEGO Jacket is facially distinguishable from the 
display of player’s tattoos where “average gameplay” was “unlikely to include the players 
with Tattoos,” the display was “small and indistinct,” the images appeared “as rapidly moving 
visual features of moving figures in groups of figure players,” and thSeoirl isdi zOea wk aSsk reetcdhuecse, d such 
that they were “not recognizable” and had limited “visual impact.” 449 F. 
Supp. 3d at 349. 
 Defendant has not established based on the TAC that the amount and substantiality 
of use factor wde.i gEhsff ienc tit os nfa Pvoorte. ntial Market 
 The fourth factor requires examination of “the effect of the use upon the potential 
market for or value of the copyrighted work.” 17 U.S.C. § 107(4). In evaluating this factor, the 
Court looks at “not only the market harm caused by the particular infringement, but also to 
whether, if the challenged use becomBiells Gwraidheasmpr eAardch, iivte ws, ill adversely affect the potential 

market for the copyrighted work.” 448 F.3d at 613. However, the 
driving concern is “not whether the secondary use suppresses or even destroys the market 
for the original work or its poNteXnItViMal dCoerripv. avt.i Rveoss,s bInust tw.,hether the secondary use usurps the 
mCaamrkpebte ollf the original work.” 364 F.3d 471, 481-82 (2d Cir. 2004). 
 explains that the market effect must be evaluated in light of whether the secondary 
use is transformative; “when a commercial use amounts to mere duplication of the entirety 
of an original, it clearly ‘supersede[s] the objects,’ of the original and serves as a market 
replacement for it . . . [b]ut when . . . the second use is transformative, market substitution is 
at least less certain, and market harm may not be so readily inferred.” Campbell, 510 U.S. at 
591. 
 Defendant argues that there are “no allegations” in the TAC that the LEGO Jacket 
“serves as a substitute for the original work” and that there could be no such finding because 
one is a “children’s construction toy figurine” sold in the “global toy market” and the other is 
a “men’s leather jacket” part of the “underground men’s fashion” scene. (Def.’s Mem. at 24.) 
Because there is no allegation that Plaintiff “would or could entIedr. the global toy market,” 
Defendant asserts the fourth factor weighs strongly in its favor. ( ) Plaintiff responds that 
“[i]t is indisputable that, as a general matter, a copyright holder is entitled to demand a 
royalty for licensing others to use its copyrighted work, and that the impact on potNenotritahl 
lJiecresneysi Mnge dreiav eGnruoeusp iIsn ac .p vr.o Ppirerro subject for consideration in assessing the fourth factor.” 
 , 74 F. Supp. 3d 605, 622 (S.D.N.Y. 2015). Plaintiff argues that 
he need not allege that he intends to enter the toy market or use the design in that market 
because Defendants’ actions “have harmed the distinctiveness and market for any derivative 
works,” including by undermining their “exclusivity,” and by setting a “dangerous precedent 
that any company can borrow copyrighted works without paying licensing fees” if they “do 
so in a dNioffretrhe Jnetr mseay rMkeetd tiah aGnr othuep original.” (Pl.’s Mem. at 24.) 
 considered the impact of the alleged infringing use on the 
licensing market, and found in plaintiff’s favor because it “maintain[ed] an active licensing 
program for the photograph.” 74 F. Supp. 3d at 622. There is no such allegation of harm here, 
however, because Plaintiff did not charge Porowski for the jacket, nor did he publish or 
license it for compensation. The Second Circuit found similar circumstances suggesBtliavnec thh avt. 
tKhoeornes had been no “deleterious effect” on the market for the copBylarnigchht, ed work. 
 , 467 F.3d 244, 258 (2d Cir. 2006). However, unlike in Plaintiff does not 
concede that the alleged infringing work “did not cause any harm” to his career or “upset any 
plans” he had for either the Concannon Jacket or any other Concannon Product; to the 
cIdo.n trary, he specifically aNlloergtehs Jtehraste Dy eMfeenddiaa nGtr’so uupse undermoinnleys the exclusivity of his brand. 
 Further, the court in did not consider the impact on the 
licensing program for the photograph; it also considered the “very real danger that other 
such media organizations will forego paying licensing fees for the Work,” an impact that went 
beyond “simply the loss of licensing revenues from this one-time use.” 74 F. Supp. 3d at 623. 
 At this stage, Plaintiff has alleged a harm to the market for his products in the form of 
the loss of royalties for this specific LEGO Jacket, the harm to the exclusivity and consumer 
view of his products, and the future harm because of the risk that other companies will follow 
Defendant’s lead and use his products in different markets without paying licensing fees. 
Plaintiff is not required to have predictively pled his complaint to meet Defendant’s 
affirmative defense, and will be given the chance to develop the record to enable the Court 
to weigh this feac. toOrv oenr aa lml Aostisoens sfomr esnutm Wmeairgyh jiundgg tmheen Fta. ir Use Factors 
 Weighing the factors in their totality, the Court denies the motion to dismiss based on 
a findinDg. ofC foanirt ruisbeu btoutr yw iCllo cpoynrsiigdhetr tIhnifsr dinegfeenmsee notn (aC souumnmt aIrI)y jaunddg mVeincat rrieocuosrd C. opyright 
 Infringement (Count III) 
 Defendant LSAS argues that Plaintiff fails to state a claim for contributory and 
vicarious copyright infringement “for the reasons set forth in LSI’s Memorandum and Reply.” 
(Def. LSAS’ Supp. Mem. at 4.) Because Defendant LSI’s arguments as to Count I have been 
rejectedE,. DTefreanddea nDtr LeSsAs SIn’ mfrointigoenm toe ndti samnids sU tnhfea dire Criovmatpiveet iCtoiounn tUs nIId aenrd 1 I5II UI i.Ss .aCl.s §o 1d1en2i5e(da. ) 
 (Count IV) 

 Trade dress infringement claims are brought under 15 U.S.C. § 1125(a), the Lanham 
Act 43(a), which provides a cause of action for use by “any person” who “uses in commerce 
any word, term, name, symbol, or device” which “is likely to cause confusion . . . as to the 
origin, sponsorship, or approval of his or her goods, services, or commercial activities by 
another person.” In addition to protecting registered marks, the Lanham Act also protects 
“trade dress”, which “includes the design and appearance of the product as well as that of the 
container and all elements making up the total visual image by which theF opcruosd Purcot diss. 
pGrreps. eInntt'el,d L tLoC c vu. sKtoamrtreir sS,a .l e. s. iCnoc.l,u Idnicn.g size, shape, color, texture, and graphics.” 
 , 454 F. Supp. 3d 229, 248-49 (S.D.N.Y. 2020). When, as 
here, the trade dress infringement claim is based on the product’s design, the plaintiff Cmaupsrti 
sShuonw G m“(b1H) n vo. nA-mfu. nBcetvioenraagliet yC, o(2rp) secondary meaning, and (3) a likelihood of confusion.” 
 motion to certif.y, Naop.p 1e9aCl IdVe1n4ie2d2PAEDCF, 2022 WL 976270, at *66 (S.D.N.Y. 
Mar. 31, 2022), , No. 19CIV1422PAEVF, 2022 WL 3137131 
(S.D.N.Y. Aug. 5, 2022). “A plaintiff must also offer a precise expression of the character and 
scope of the claimed trade dress,” and describe the elements of “design with specificity to be 
 Sherwood 48 Assocs. v. Sony Corp. of Am., 

afforded trade dress protection.” 76 Fed. Appx. 389, 
391 (2d Cir1. .2 0D0e3s)c. r iption of the Trade Dress 
 To survwivhei cah motion to dismiss, a plaintiff seehkoinwg protection for his tradHe edlrleers sI nmcu. svt. 
sDpeescigifny W biotthhin “ Reach, Ifenac.tures are distinctive” and “ they are distinctive.” 
 , No. 09–CIV–1909, 2009 WL 2486054, at *6 (S.D.N.Y. Aug. 14, 2009). 
While “trade dress may protect the ‘overall look’ of a product” as Ldaisntdinsccatipvee ,F iotr smtisl,l Imncu. svt. 
aCrotliucmulbaitae C“tahseca sdpee Cciofi.c elements which comprise its distinct dress.” 
 , 113 F.3d 373, 381 (2d Cir. 1997). Elements of a trade dress definition 
may incluPdae dd“fienagttuorne sC osurpc.h va. sA sttizikei, Ismhappoert, ecrso lo&r Doris tcroiblourto rcso, mIbnicn.,ations, texture [or] 
graphics.” Walt Disney Co 9. 9v.6 G oFo.2ddti m5e7s7 H o(m2de 
CViird.e1o9 9Co3r)p, as well as “the appearance of the product itself.” 
 ., 830 F. Supp. 762, 766 (S.D.N.Y. 1993). When seeking “trade dress protection for 
an entire product line,” a Ypularimnatinff Dmeussigt na,l sIon ce.s vta. bPlAisJh, Itnhca.t the “‘overall look’ in each separate 
product iWs ‘aclotn Dsiissnteeny tC.’”o . , 262 F.3d 101, 116 (2d Cir. 2001) 
(quoting , 830 F. Supp. at 766). If “a trade dress is composed exclusively of 
commonly used or functional elements,” it “might suggest that that dress shouLledS bpeo rrtesgaacr, dInecd. 
av.s K u nMparrott Ceoctrapb.,le or ‘generic,’ to avoid tying up a product or marketing idea.” 
 754 F.2d 71, 76 (2d Cir. 1985). 
 Plaintiff argues that his trade dress includes three distinct elements that appear in 
both his ready-made and his custom pieces: “(1) short, provocative phrases; (2) satirical 
commentary on punk rock and mainstream pop culture; (3) hand-painted graffiti-style 
lettering.” (Pl.’s Mem. at 25.) Defendant argues that differences in the phrasing of Plaintiff’s 
trade dress definition in the TAC, such as using “short, provocative statements” in one 
section, and “unique combination of provocative, tongue-in-cheek phrases relating to pop 
culture” or “pop culture pun” in others, demonstrates a “failure to articulate a single 
definition.” (Def.’s Mem. at 29.) Defendant further asserts that the definition is “generic and 
not sufficiently specific” because it merely lists categorieIsd .that do not allow an observer to 
 6 
determine “whether a work falls within this definition.” ( ) 
 At this stage, the Court accepts Plaintiff’s definition for two reasons. First, the 
definSihtieornw ioso sdu 4ff8ic iAesnstolcyi aspteesc, ific because the level of detail distinguishes this case from ones 
like where the court found that describing the trade dress as “the 
unique configuration and ornamentation of One Times Square, Two Times Square and 1600 
Broadway and the advertising and signage display on One Times Square, Two Times Square 
and 1600 Broadway” was inadequate because it failed to identify “the specific elements that 
comprise each building’s identifiable trade dress.” 76 Fed. Appx. at 391. Plaintiff’s definition 
allows the Court to determine by visual inspection whether each item of clothing falls within 
the proposed definition. Some variation in the phrasing used to describe the trade dress is 
not fatal to the definition, because the “product's trade dress is not, in a legal sense, 
the combination of wordiss which a party uses to describe or represent [its] ‘total image.’ 
Rather, the tradCea rdtireers, sI nc .t hv.a Ft oimura Sgtea rit Jseewlfe, lhryo wCreevaetri oint sm, Ianyc .,be represented in or by the 
written word.” No. 01 Civ. 11295, 2003 WL 
21056809, at *5 (S.D.N.Y. May 8, 2003). Further, at least one court has found that even 
“pictures in the complaint” were sufficient to convey the “overall image” of a trade dress. 
Here, Plaintiff’s photographs in the TAC sufficiently pled that his product line makes use of 

6 
 Defendant also argues that the trade dress infringement claim does not state a claim upon 
which relief can be granted because the trade dress is limited to clothing, whereas the LEGO 
Jacket is part of the “construction toys” class of goods. However, the difference between the 
market for Plaintiff’s trade dress and the allegedly infringing product goes not to whether 
the trade dress is defined with adequate specificity, but instead to the proximity of the 
products in the market for purposes of consumer likelihood of confusion, and is addressed 
below in Section III(D)(3)(c). 
 Maharishi Hardy Blechman Ltd. v. 
tAhbee reclreommebniets & h Fei tcclha iCmos as part of his trade dress. 

 ., 292 F. Supp. 2d 535, 545 (S.D.N.Y. 2003). Second, Plaintiff also 
alleges in the TAC that the defined elements are distinctive “because no other artist or 
designer has released caf. Clianrea woaf yc lHoothmine,g I ncco. nvt. aPiantitnegr nt Bhirsa nudnsi,q Iunce. , combination of specific 
elements.” (TAC ¶ 23); No. 20 CIV. 10469, 2021 
WL 1226156, at *8 (S.D.N.Y. Apr. 1, 2021) (granting a motion to dismiss for insufficient trade 
dress definition because although the definition was sufficiently specific, it did not explain 
how the product (a set of pans) “differed from other cookware.”) 
 Defendant also argues that the variation in “text color, length, style” of the design 
elements on Concannon Products and “subject matter of the text” painted on them 
demonstrates fatal inconsistency between the products aWnadl tt hDei stnreayd e dress. (Def.’s Mem. at 
31.) Defendant’s argument relies on the trial decision in . finding inconsistencies 
in trade dress displays demonstrated lack of trade dress protection Plaintiff points out that 
he does not claim consistent text color, length, and style as part of his trade dress; rather, 
athroe se variations serve to highlight the “hand-painted style” and “pop-culture references” that 
 part of his trade dress. (Pl.’s Mem. at 27.) Plaintiff also argues that even the custom-made 
pieces include the trade dress elements while also incorporating a customer’s specific 
 7 
interest or preferences. 
 There arWe aadltm Diitstneedyly some similarities betwWeeanl tP Dlaiisnnteiyff ’s trade dress arguments and 
those made in . However, the court in made its determination that 

7 
 Plaintiff offers an example to demonstrate the application of his definition: Plaintiff explains 
that the phrase “THYME IS ON MY SIDE” on the Concannon Jacket is a refereIndc.e to the Rolling 
Stones song “Time is on My Side,” commenting in a short, satirical phrase on “the resurgence 
of punk rock” while also nodding to Mr. Porowski’s interest in cooking. ( ) The TAC also 
confirms that the text of the phrase is hand-painted, and a visual observation demonstrates 
the “graffiti-style lettering.” (TAC ¶ 19-20.) 
the differences in packaging outweighed any consistent elements of the proposed trade 
dress after “observing the demeanor of the witnesses on direct and cross-examination, and 
weighing th e evidence, particularly after viewing” the packages during the bench trial. 830 
F. Supp. at 768. Here, on the other hand, the Court is evaluating only the handful of 
Concannon works that are included in the TAC, all of which deSmeeo nstrate a consistent “overall 
look” and fall within the parameters Plaintiff has defined. ( TAC ¶ 19-20.) At this stage, 
the Court accepts the assertion that the variations in the non-trade dress elementsD oifs nheiys 
product line “highlight” the distinctive elements rather than overshadow them as in 
and leave an evaluation of whether consumers would feel the same for expert opinion and 
factual resolution at a later stage. 
 The Court determines that Plaintiff has proposed an adequately specific trade dress 
definition. 2 . Nonfunctionality and Secondary Meaning 
 8 
 Trade dress acquires secondary meaning when “in the minds of the public, the 
primary significIannwcoeo odf Laa b[moraartko]r iiess ,t Ion cid. evn. Itvifeys tLhaeb osorautrocrei eosf, Itnhce product rather than the 
product itself.” ., 456 U.S. 844, 851, n. 11 
(1982). “Secondary meaGnTinFgM e,x Iinstcs. wv. hSeorleid ‘ tChleo tphuinbgli,c I insc moved in any degree to buy an article 
because of its soGuerncees.’e”e Brewing Co. v. Stroh Brewing .C, o215 F. Supp. 2d 273, 294 (S.D.N.Y. 
2002) (quoting ., 124 F.3d 137, 143 n. 4 (2d Cir. 

8 
 Because Defendant does not allege that the trade dress is functional, nor is there any 
indication that the trade dress as defined by Plaintiff would put competitors at a non-
reputation-related disaSdeev aMnatahgaer iwshei rHea trhdey CBoleucrhtm toa np Lrotdte. cvt. Aitb, etrhcer oCmobuiret &a sFsiutcmhe Cso t.hat the 
trade dress is nonfunctional and focuses its analysis on whether the trade dress has acquired 
“secondary meaning.” , 292 F. 
Supp. 2d 535, 543 (S.D.N.Y. 2003)(“Where the asserted trade dress teaxkteenn dtso gtoet htheer ‘overall 
look’ of the combination of features comprising a product or product line, the Court must 
evaluate the distinctiveness and functionality of those features , not in 
isolation.”) 
1997)). The Second Circuit has articulated six non-exclusive factors for courts to consider 
when weighing secondary meaning: “(1) advertising expenditures, (2) consumer studies 
linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, 
(5) aCtthermistpitasn Ltoo upbloaugtiianr iSz.Ae . vth. Yev ems aSrakin, t aLnadu re(6n)t Almen. gHthol dainngds , eInxcc.lusivity of the mark's 
use.” , 696 F.3d 206, 216 (2d 
CTihro. m20p1s2on). MBeecda. uCsoe. v“p. Profiozfe or fI nsecc.ondary meaning entails vigorous evidentiary requirements,” 
 , 753 F.2d 208, 217 (2d Cir. 1985), courts should be cautious 
in finding lack of secondary meaning at the motion to dismiss stage. 
 According to Defendant, Plaintiff fails to satisfy several of these factors. First, it 
maintains that Plaintiff does not make any allegations as to the advertising expenditures or 
consumer studies linking the trade dress to a source. (Def.’s Mem. at 34.) Second, Defendant 
views the fact that celebrities have worn Plaintiff’s clothing as insufficient to establish 
secondary meaning because there are no allegations that Plaintiff had an increase in sales or 
in social media attention after the photos were taken of his clothes being worn, and no proof 
“that consumers would rIedc. ognize the asserted trade dress and claimed product line as a 
result of this publicity.” ( at 34.) Plaintiff responds that as a “single artist working on his 
own,” it is improper to expect him to establish every one of the nonexclusive factors, and that 
rather than relying on “consumer surveys” and “mass advertising,” Plaintiff relies on his 
online presence and social media, as well as his products’ “certain popularity within celebrity 
circles” to sell his products. (Pl.’s Mem. at 28.) Plaintiff also points out that the TAC attached 
samples of infringing works that sought to copy his trade dress, and that he has pled that the 
appearance and crediting of his works on film and television shows has “contributed to 
consumers associating” his trade dress with Plaintiff. (Pl.’s Mem. at 29.) 
 At this stage, Defendant’s argument is inappropriate because “[n]one of these 
elements is determinative and not every one of them must be proved to make a showing of 
 Landscape Forms see also GeigTech E. Bay LLC 
sve. cLountrdoanr yE mlecesa. nCion.g.” , 117 F. Supp. 2d at 366; 

 , 352 F. Supp. 3d 265, 282 (S.D.N.Y. 2018) (denying a motion to dismiss 
based on lack of secondary meaning because “none of [the six factors] is generally amenable 
to determination on a motion to dismiss,” and “Defendant's arguments regarding the 
qualitative nature of Plaintiff's advertising, its lack of consumer surveys, and questions 
regarding prior attempts to plagiarize are all evidentiary in nature and properly reviewed 
on [a] motion for summary judgment.”) does 
 Further, as Plaintiff observes, the TAC plead facts that satisfy several of the 
factors when viewed in the context of Plaintiff’s specific circumstances. For example, while 
Plaintiff does not allege that he spends money advertising his products, the TAC alleges that 
his work has “been exhibited in galleries and featured on film and television and in 
magazines and art publications,” and that he has “gained notoriety” for his “popular” line of 
clothing, (TAC ¶ 18-19), using his trade dress to “identify, promote, and solidify his brand” 
in the eyes of the public. (TAC ¶ 20.) According to Plaintiff, he has been making Concannon 
products “[o]ver the past decade,” and “no other artist or designer has released a line of 
clothing containing this unique combination of specific elements,” weighing in favor of the 
brand’s exclusivity, and he has received unsolicited media attention via photographs of 
celebrities “wearing and promoting” Concannon products, often “specifically identify[ing] 
[Plaintiff] as the source of those Products, on social media and in interviews.” (TAC ¶ 23-
 9 
30.) As for sales, Plaintiff alleges that his line of products on his website is “popular,” (TAC 
¶ 19), and that his custom pieces are “highly sought after,” “very valuable,” and often sell “for 

9 
 Plaintiff provides specific examples of thQius—eerfo Ery eexample, the TAC includes a screenshot of 
Antoni Porowski wearing a Concannon t-shirt and crediting Plaintiff by tagging his 
Instagram handle while also promoting ; the post received 66,563 likes. (TAC ¶ 
29.) 
hundreds or thousands of dollars.” (TAC ¶ 33.) Plaintiff further attached exhibits showing 
that “numerous infringers have sought to capitalize” on his trade dress “by selling counterfeit 
versions” of his products. (TAC ¶ 35; Exhibits B-F.) Heptagon Creations, Ltd. V. Core Group 
Mktg., LPLlaCi,n tiff’s allegations distinguish this case from 
 on which Deaffef'nddant relies. No. 11 CIV. 01794 LTHSe, p2t0a1go1n W CrLe a6t6io0n0s2, 67, at *8 
(S.D.N.Y. Dec. 22, 2011), , 507 F. App'x 74 (2d Cir. 2013). In the court 
found that it was not enough for the plaintiff to show its furniture line “has been purchased 
by celebrities, featured in various magazines, and commissioned for use in the decoration of 
public and private spaces” because it did not make any allegations concerning “advertising 
expenditIudr. es, or consumer surveys linking the ANDRE JOYAU furniture line to a particular 
source.” The plaintiff there also lacked details or support on factors like sales, exclusivity, 
unsolicited media attention, or attempted counterfeiting; Concannon’s allegations, on the 
other hand, allege facts addressing each of those factors. Further, the absence of consumer 
surveys or advertising expenditure claims is more notable for a company producing a 
furniture line than for a single artist who trades on exclusivity and the “underground” 
perception of his work. GTFM, Inc. v. Solid Clothing, Inc 
 Plaintiff rightly compares this case instead to ., 215 F. 
Supp. 2d 273, 294 (S.D.N.Y. 2002). There, the court found after a bench trial that due to the 
sales volume, plaintiff’s consistent use of the design element as a “designation of source,” and 
the efforts of other companies to copy the mark, plaintiff’s proof was sufficient to find that 
the mark acquired secondary meaning; the fact that it “failed to present consIdu.m GeTrF sMu rvey 
evidence” was not dispositive because “every element need not be proved.” also 
highlights that the key inquiry the six factors are meant to get at is whether the public is 
moved to buy the product because of its source; Plaintiff has pled that “customers reach out” 
for his custom orders “with the expectation that any product they buy from Concannon will 
feature the Trade Dress,” and that his trade dress “serves as a source identifier” that 
consumers have “coSmeee G teoi gaTsesochc iEat. eB”a wy iLtLhC h ,i s products. At this stage, that is all the pleading 
standard requires. 352 F. Supp. 3d at 284 (“[c]ourts have assumed 
secondary meaning at the motion to dismiss stage on very minimal pleadings, recognizing 
that determination of many factors going to secondary meaning will require discovery.”) 
 The3 C. ouLritk feinlidhso tohda to Pf lCaoinntfiuffs hiaosn s ufficiently pled the existence of secondary meaning. 
 To evaluate the likelihood of confusion between the Plaintiff’s trade dress mark and 
Defendant’s allegedly infringing product, the Court must examine whether “an appreciable 
number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, 
as to the source of the goods in question, or are likely to believe that the mark's oNwakneedr 
sCpoownbsooyr evd. C, BenS,d orsed, or otherwise approved of the defendant's use of the mark.” 
 844 F. Supp. 2d 510, 517 (S.D.N.Y. 2012S)t. rTehetew pilsaei nMtiafpf sm, Iunsct. svh. oVwan tdhaamt t, hIenrce 
is “a probability of confusion, not a mere possibility.” Polaroid ., 
159 F.3d 739, 743 (2d Cir. 1998). The Second Circuit uses the eight factors to 
evaluate the likelihood of confusion: 
 (1) strength of the plaintiff's trade dress; (2) similarity of the trade dresses; 
 (3) proximity of the products in the marketplace; (4) likelihood that the 
 plaintiff will bridge the gap between the products (enter a market related to 
 that in which the defendant sells its product); (5) evidence of actual confusion; 
 (6) the defendant's bad faith; (7) quality of the defendant's product; and (8) 
 sNoapth. Oisrtgicaantiicosn, Ionfc t. hve. N rueltervaacenut tciocanls Cuomrepr group. 

 ., 426 F.3d 576, 578 (2d Cir. 2005). Evaluation 
of these factors “is not a mechanical process where the party with the greatest number of 
factors weighing in its favor wins. Rather, a couTrtif fsahnoyu &ld Cfooc. uvs. Coons ttchoe Wulhtiomleastael eq Cuoersption of 
whether consumers are likely to be confused.” ., 971 
F.3d 74, 85 (2d Cir. 2020). 
 Courts have granted motions to dismiss “where simply looking at the work itself, and 
the context in which it appears, demonstrates how implausible it is thaRto ab evritesw v.e Brl iwssill be 
confused into believing that the plaintiff endorsed the defendant's work.” , 229 
F. Supp. 3d 240, 251 (S.D.N.Y. 2017). However, the “general rule” is that determining 
likelihood of confusion is “usually reserved for a jury, as it requires a fact intensive 
examinaAti.oVn.E .Lo.fA . ‘Itnhce. vp. Erosbtaatbel eo f rMeaarcitliyonn sM oonfr oper, oLsLpCective purchasers of the parties’ 
goods.’” Pirone v. MacMillan, Inc. , 364 F. Supp. 3d 291,s e3e0 9al s(oS .MD.eNr.cYk. 
2&0 C1o9.,) I(nqcu. ov.t iMnged iplan Health Consulting,, I8n9c4. F.2d at 579, 584 (2d Cir. 1990)); 
 , 425 F. Supp. 2d. 402, 412 (S.D.N.Y. 2006) (“the 
likelihood of confusi on is a fact-intensive analysis that ordinarily does not lend itself to a 
motion to dismiss.”) 
 Defendant argues that the TAC fails to allege “the strength of [Plaintiff’s] alleged trade 
dress,” the proximity of the copyrighted work and the alleged infringing work, actual 
confusion, the quality of the alleged infringing product, the sophistication of the buyer, or 
that Defendant was “attempting to deceive the purchaser.” (Def.’s Mem. at 36.) Defendant 
further asserts that Plaintiff is not in competition with LEGO because of the difference 
between the markets for Concannon Products and LEGO products. (Def.’s Mem. at 37-38.) 
Plaintiff contends that his trade dress is strong, that there is a substantial similarity between 
the Concannon Jacket and the LEGO Jacket, that there is a proximity between the works that 
creates a likelihood of confusion, and that he has pled specific facts that allow for an inference 
of bad faith. (Pl.’s Mem. at 30.) 
 Plaintiff’s TAC does not make any allegations related to three of the factors—bridging 
the gap between markets, the quality of defendant’s product, and consumer sophistication—
and so at this time, none of the three weighs in his favor. An analysis of the five remaining 
factors follows. 
 a. Strength of the Mark 

 Courts evaluating a trade dress’ strength look to “the mark's inherent distinctiveness, 
based on the characteristics of the mark itself, and its acquAikreirdo dLiLsCti vn.c Htiovuesnee osfs ,C bhaeasethda omn, 
aInscs.ociations the mark has gained through use in commerce.” 
 , 946 F. Supp. 2d 324, 333 (S.D.N.Y. 2013). Defendant argues that Plaintiff “does not allege 
 10 
the strength of his alleged trade dress,” (Def.’s Mem. at 36.) Plaintiff asserts that the same 
elements that give the trade dress secondary meaning also “establish a unique source 
identifier” for Plaintiff, making it unique. As discussed above in the section on secondary 
meaning, Plaintiff has pled facts regarding both the distinctive elements of the trade dress 
and the associations consumers now make with his trade dress based on the media attention 
and social media presence of his products. 
 Taking Plaintiff’s allegations as true and drawing inferences in his favor, as required 
at this stage, thbi.s fDacetgorre we eoifg hSism inil faarviotyr of Plaintiff. 
 The degree of similarity between the trade dress and the allegedly infringing product 
turns on “Ewshteeeth Learu cdoenr fuInscio. nv. iTs hper oGbaapble among numerous customers who are ordinarily 
prudent.” , 108 F.3d 1503, 1510 (2d Cir. 1997). According to 
Defendant, a “conclusory allegation” that the LEGO Jacket is a “near exact” copy of the 
Concannon Jacket is insufficient to survive its motion to dismiss. (Def.’s Mem. at 36.) Plaintiff 
points to allegations that the LEGO Jacket “borrows the Trade Dress’s hand-painted graffiti 
style lettering” and attempts to invoke Plaintiff’s “signature tongue-in-cheek pop culture 

10 River Light V, L.P. v. Olem Shoe Corp 
 “The strength of the trade dress factor consideorns r tehceo nssaimdeer afaticotno rins paas rwthether the trade 
dress has secondary meaning.” ., No. 20 CIV. 7088 (LGS), 
2022 WL 4484575, at *6 (S.D.N.Y. Sept. 27, 2022), , No. 20 CIV. 7088 
(LGS), 2022 WL 16722210 (S.D.N.Y. Nov. 4, 2022). 
reference by using the phrase ‘REBUILD THE WORLD’ as a circular reference to LEGOs.” (Pl.’s 
Mem. at 30.) A visual comparison of the two products reveals similarity in the placement and 
general design; the safety pins, the peace sign, and the yang symbol are all placed in similar 
places on both jackets, and the remaining elements that LEGO modified often still bear visual 
resemblance to the original, such as the visual blur around the words on the back of the 
jacket, the use of a short all-caps phrase on the back of the jacket, and a LEGO skull placed on 
the LEGO Jacket in the spot where a human skull shape is placed on the Concannon Jacket. 
 While tAhcet i“vgiesnioenr aBl l‘ipzuzraprdo,s eIn’ ocf selling products for profit, ” is too vague for a finding 
of similarity, ., 450 F. Supp. 3d at 481 Plaintiff has alleged that 
Defendants “painstakingly copied” the Concannon Jacket in order to “benefit from the 
association” with Plaintiff’s trade dress, and with the intent of creating a perception of 
“affiliation” between Defendants and Plaintiff. (TAC ¶ 51-52.) This factor is a close call. 
Defendant has a colorable argument that the purpose of the uses is facially different based 
on the facts in the TAC. However, the TAC plausibly alleges that the purpose of the use was 
to create a perception of affiliation, and the two products are similar based on a visual 

comparison. While Defendants may ultimately prove otherwise after the benefits of 
discovery by demonstrating that their purpose in creating the Lego Jacket was accurate 
portrayal, a marketing campaign, or something else, this factor weighs in Plaintiff’s favor at 
 11 
this stage. 

11 See DeClemente v. Columbia Pictures Indus., Inc.
 However, the role of the different purposes of the jackets will presumably assume an 
important role in the developed record. , 860 
F. Supp. 30, A4M7 (GEe.nD.. NLL.YC. v1.9 A9c4ti)v (ishioonld Binligz ztahradt , iIfn “ct.h, e marks are used for different purposes 
and are prDeeseCnletmede nttoe the public differently, evPeonl atrhooiudgh they say the same thing, they are 
dissimilar); 450 F. Supp. 3d 467, 481 (S.D.N.Y. 2020)
(applying to find that the second factor weighed in Defendant’s favor 
where Plaintiff, manufacturer of the Humvee vehicle, had the purpose of “using [the Humvee] 
mark is to sell vehicles to militaries,” whereas Defendant was a video game company 
 c. Proximity of the Products 

 The proximity factor “focuses on whether the two products compete with each other,” 
and whether theL agnogo dvs. R“seetr. vLeiv tihneg sPaumble'g p Cuor.pose, fall within the same general class, or are 
used together.” , 949 F.2d 576, 581 (2d Cir. 1991). Defendant 
correctly argues that there is no proximity because Plaintiff does not claim that he is 
competing in the global toy market, or that there is a mutual consumer basis. Based on the 
lack of factual dal. leAgacttiuoanls C toon thfues cioonnt rary, this factor weighs in favor of Defendant. 
 Determining whether there was actual confusion requires the Court to “consider the 
evidence that consumers are actually confused as to the origin of a particular product or 
serviceD oisrn aesy t Eon wtehrest. hv.e Sra trheel ljiunior user of a mark is sponsored by or affiliated with the senior 
user.” , 322 F. Supp. 3d 413, 435 (S.D.N.Y. 2018). Plaintiff has pled that 
“Porowski has continuously credited Concannon as the designer of the Concannon Jacket,” 
which has led to consumers readily associating Plaintiff as the source of the Concannon 
Jacket. (Pl.’s Mem. at 31, TAC at 43, 66.) Because Plaintiff is also “prominently known as a 
designer that frequently provides clothing for Porowski and Queer Eye,” Plaintiff asserts thIadt. 
consumers are “likely to falsely associate Concannon with the design” of the LEGO Jacket. 
 At this stage, this factor does not weigh in Plaintiff’s favor; alleginga ctthuaatl customers 
“likely” associate Plaintiff with the Lego Jacket does not satisfy a showing of confusion. 
However, this factor is not well suited for resolution on a motion to dismiss, as actual 
confusion is difficult to demonstrate without the benefit of further factual development on 
actual consumee.r rBeaacdt iFoanist,h a nd so will be given limited weight. 

portraying the Humvee vehicle in the games “to create realistically simulating modern 
warfare video games for purchase by consumers”.) 
 The bad faith factor “assesses whether the junior user intentionCaalplyr i cSoupni eGdm banHd 

intended to benefit off the goodwill of the senior user's entire trade dress.” ., 
595 F. SupSpt. a3rdb uact k1s9 C1o.r Wp. hvi. lWe “odlfeel'isb Beoraroteu gcohp Cyoifnfege m, Ianyc. indicate that the defendant acted in 
bad faith,” , 588 F.3d 97, 118 (2d Cir. 2009), the 
crux of the inquiry is “whether the defendant adopted its mark with the intention of 
capitalizing on H[tyhpen]o ptliac inHtaiftfs',s Lretdp.u vt.a tWioinn taenrdm gaonotedlw Eilnl taenrsd., [LoLnC] any confusion” between the 
two products. , 335 F. Supp. 3d 566, 591 
(S.D.N.Y. 2018). 
 The TAC alleges “[u]pon information and belief” that Defendant LSAS and Defendant 
LSI “jointly conspired to create, advertise, and sell a LEGO set that directly copied the 
Concannon Jacket.” (TAC ¶ 46.) Plaintiff asserts that the allegation is supported by the fact 
that the designers of the Fab Five set “admit[ed]” that they “wanted to recreate” the “iconic 
leather jacket” Mr. Porowski was known for wearing in the LEGO version. (Pl.’s Mem. at 31.) 
Because Defendant made a “near exact copy” of the Concannon Jacket without taking steps 
to “credit or compeIdn.sate” Plaintiff for his original work, Plaintiff maintains that the Court can 
infer bad faith. ( ; TAC ¶ 46, 52.) Defendant responds that merely “invok[ing]” the 
Concannon Jacket in the design of the LEGO Jacket is not evidence of bad faith, and that none 
of Plaintiff’s allegations allow for an inference that Defendant was trying to “deceive the 
purchaser.” 
 The allegation that Plaintiff “conspired” to “directly cop[y]” 
the Concannon Jacket, when supported by the other facts discussed above, allows for a 
plausible inference of bad faith. This factor weighs slightly in Plaintiff’s favor when taking 
the facts of thef .c omOvpelarianltl aAss tsreuses manedn dt roafw tihneg Pinoflearreonicde Fs ainct hoirss f avor. 
 Three of the eight factors weigh in Plaintiff’s favor at this stage, and several require 
further factual development before the Court can fullyG eeviaglTueacthe tEh. eBmay. H LoLwCever, “the Polaroid 
test is nonexclusive and no one factor is dispositive.” , 352 F. Supp. 3d at 
285. When examined as a whole, Plaintiff’s allegations as to the strength of the trade dress, 
the similarity between the products, and bad faith by Defendants in copying the Concannon 
Jacket create a plausible inference that consumers are likely to be confused inStoe et hidin. king that 
Plaintiff endorsed or was affiliated with the LEGO Jacket and the Fab Five set. (denying 
a motion to dismiss where plaintiff alleged that the use of the trade dress waslikely to cause 
“confusion, mistake, or deception as to the affiliation, connection, and/or association of 
Defendant with [plaintiff] and “as to the origin, sponsorship, and/or approval of the 
infringing products,” bad faith was evidenced by “the similarity of the infringing products” 
and “continuing disregard” for plaintiff’s rights s, eaen adl stho eTrhee w Caosu ast “esaturi kSoincg'y s, iImnci.l avr. iCtyo”u bstaesaeud, 
on “side-by-side photographic comparisons”); 
498 F. Supp. 3d 287, 310 (D. Conn. 2020) (denying a motion to dismiss where the allegedly 
infringing uses included the use of numerous materials, products, and advertisements with 
the protected mark, and the creation of a perception that would confus e the consumer as to 
the plaintiff’s “endorsement or involvement” of defendant’s activities). 
 At t4hi. s eOavrelyr asltla Ages,s Pelsasimnteifnf th aosn s Purffiimciaen Ftalyc ipel eTdr aa dliek eDlirheososd I noffr cionngseummeenrt c onfusion. 
 Because Plaintiff has adequately defined his trade dress, alleged that it is 
nonfunctional, has secondary meaning, and that there is a likelihood of confusion between 
the tradFe. dVreiossla atniodn t hoef CinUfrTinPgAi nUgn pdreord Cuoctn, nth. eG meno.t Siotnat t.o § d 4is2m- 1is1s0 Cao, uentt s IeVq i s( Cdoeunnietd V. ) 

 CUTPA provides that “[n]o person shall engage in unfair methods of competition and 
unfair or deceptive acts or practices in the conduct of any trade or commerce.” Conn. Gen. 
Stat. § 42-110b(a). CUTPA claims can be based on either an “actual deceptiveU plbrariccthic ve.” G orro tahn 

unfair practice—that is, a “practice amounting to a violation of public policy.” , 
310 Conn. 375, 409 (2013). An act or practice is actually deceptive under CUTPA when there 
is: (1) “a representation, omission, or other practice likely to mislead consumers”; (2) the 
consumer “interpret[s] the message reasonably under the circumstances”; and (3) “the 
misleading representation, omisSsmioitnh, fioerld pArsascotcisc.e, L L[iCs ]v . mToaltlearniadl B—atnhkat is, likely to affect 
consumer decisions or conduct.” , 86 Conn. App. 14, 28 
(2004) (internal quotation marks omitted). To determine whether an act or practice is unfair 
under CUTPA, Connecticut courts look to the following factors: 
 (1) [W]hether the practice, without necessarily having been previously 
 considered unlawful, offends public policy as it has been established by 
 statutes, the common law, or otherwise—in other words, it is within at least 
 the penumbra of some common law, statutory, or other established concept of 
 unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; 
 [and] (3) whether it causes substantial injury to consumers, [competitors or 
Ulbrichother businesspersons]. 

 , 310 Conn. at 409, 78. 
 As addressed above, Plaintiff’s Lanham Act allegations survive the motion to dismiss, 
and thus serve as a sufficient basis for his CUTPA claim as well. The motion to dismiss Count 
VIV i.s denCioedn.c lusion 
 Defendant LSI and LSAS’ motion to dismiss [Doc. # 35] is DENIED. The parties are 
directed to file an amended 26(f) Report in 14 days. 
 IT IS SO ORDERED. 

 ________/s/_________________________________ 

 Janet Bond Arterton, U.S.D.J. 

Dated at New Haven, Connecticut this 15th day of March, 2023